UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

Ernest Adimora-Nweke                    §
*Plaintiff*                              §
v.                                       §
*Property Acquisition Services, Inc., North Fort*
*Bend Water Authority, AT&T, Comcast,*
*CenterPoint Energy, Mark Heidaker, Steve*
*Bonjonia, & Sean Patrick Kennedy*
*Defendants*

Civil Action No. 4:22-cv-03155

United States Courts
Southern District of Texas
**FILED**

**NOV 07 2022**

Nathan Ochsner, Clerk of Court

## PLAINTIFF'S 3rd AMENDMENT TO ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT & CLERK:

COMES NOW Ernest Adimora-Nweke, Plaintiff, in the case with the style number above, and hereby files this 3rd amendment to original complaint, and will show as follows:

### SUBJECT PROPERTY:

6826 Caddo Lake Lane, Houston, TX, 77083, Harris County; jointly owned by (H) Ernest A. Nweke, and (W) Ngozi Adimora-Nweke, as a homestead property, since July 1993. Harris County Property Records ("HCPR") File No(s): P358971 (07/27/1993) & U994839 (04/19/2001).

### PARTIES:

Plaintiff(s):

Plaintiff, <u>Ernest Adimora-Nweke</u>, *pro-se*, (a) remotely works from, and is a resident of the homestead "subject property:" 6826 Caddo Lake Lane, Houston, TX, 77083; (b) is counsel and attorney-in-fact for **his mother**, Plaintiff, <u>**Ngozi Adimora-Nweke (a "Real Party of Interest,"**</u> and **homestead owner)** in all claims and related matters on the subject property; and (c) brings all claims on behalf of himself, Ngozi, and all necessary or interested current and putative Plaintiff(s) – including all subject property's past & future owners, residents, invitees, & beneficiaries.

Defendant(s):

<u>AT&T Corporation</u>, and/or <u>AT&T Services Inc.</u>, is a duly registered Texas entity. It has responded to this suit via <u>**Southwestern Bell Telephone Company d/b/a AT&T,**</u> a duly registered TX entity.

1

Comcast Corporation, **Comcast Holdings Corporation** ("Comcast"),[12] and Comcast Cable, are duly registered entities headquartered at 1701 John F. Kennedy Blvd. FL 32 C/O D. Zambrano Philadelphia, PA 19103-2855, and doing business on the subject property independently, or via or with Comcast of Houston, LLC. "Comcast" was served citation and has responded. Comcast Holdings Corporation lacks a TX registered agent, but may be served process via TX Sec. of State's listed address: 1500 Market St., C/o Comcast Tax Dept. Philadelphia, PA 19102-2100.

CenterPoint Energy Inc., Houston Light & Power's successor-in-interest, is a duly registered Texas entity. It has responded to this suit and alleged **CenterPoint Houston Electric, LLC** & **CenterPoint Energy Houston Electric, LLC**[3] are also alleged to be Houston Light & Power ("HL&P")'s successor-in-interest, are supposedly duly registered Texas entities. If necessary, per court order, **CenterPoint Energy Houston Electric, LLC** may be served process via its registered agent, CT Corporation System, 1999 Bryan St., Suite 900, Dallas, TX 75201. **CenterPoint Houston Electric, LLC** may be served process via CenterPoint Energy Inc.'s General Counsel, **Monica Karuturi**[4], at CenterPoint Energy, Inc., 1111 Louisiana St. Ste. 264, Houston, TX 77002.

North Fort Bend Water Authority ("NFBWA") is a duly registered local government entity. It was served process via its counsel, Christina L. Miller, (cmiller@abhr.com) at Allen Boones Humphries Robinson, LLP, and has responded to this suit.

Mark Heidaker is the founder and president of Property Acquisition Services, LLC ("PAS"), as successor to or d/b/a Property Acquisition Services, Inc. ("PAS") a company doing business in Texas, and who along with PAS' board of directors, was involved in the matters complained of. Mark Heidaker and PAS has responded to this suit.

Steve Bonjonia is a Texas resident, and at all relevant times, a Vice President executive at PAS and/or NFBWA, and involved in the illegal actions pled. He has responded to this suit.

---

[1] Comcast Corporation, Comcast Holdings Corporation, & Comcast of Houston, LLC are altogether and individually be referred to as "Comcast."

[2] Plaintiff, Ernest Adimora-Nweke, noticed and communicated with the General Counsels of Comcast Corporation, including a **Thomas J. Reid** and **Lynn Charytan**, (non-TX resident **putative Defendant(s) to be served process via Comcast PA address**) since Feb 2022, on the matters, and prior to Comcast's further harmful illegal activities on Plaintiffs and the subject property, its owners, residents, invitees, beneficiaries, etc. Such is basis for §1986 claim per Comcast executives' actual knowledge and refusal to prevent the ongoing conspiracy and harm on Plaintiff(s).

[3] Defendants CenterPoint Energy Inc, CenterPoint Houston Electric, LLC, CenterPoint Energy Houston Electric, LLC, and Houston Power & Lighting Co. are altogether and individually referred to as "CenterPoint" or "HL&P."

[4] Counsel, Ernest Adimora-Nweke, emailed said Ms. Karuturi on 3/21/2022, on the claims. HL&P retained counsel who provided Counsel with actual knowledge of the 1966 agreement and the 1977 agreement's additional easement, plat, and replats. HL&P is obligated to defend against the deed terms. Hence, a basis for also §1986 claim per HL&P executives' long-standing actual knowledge and refusal to prevent the ongoing conspiracy and harm on homeowners.

<u>Sean Patrick Kennedy</u> is a resident of TX, and an employee of PAS during all the relevant times, and involved in the illegal actions pled. He has responded to this suit.

**<u>City of Houston</u>**[5] & **<u>Houston Police Department</u>** ("HPD"), may be respectively served process via (a) City Secretary, Pat J. Daniel, or any other such designated, at 900 Bagby St. Room, P101, Houston, TX 77002; and (b) Troy Finner, Chief of Police, 1200 Travis St., Houston, TX 77002.

<u>Other Interested Parties to be served or sent file-stamped copies in due course:</u>

<u>Braewood Glen Community Association, Inc.</u> c/o Kathy Ann Terry, The Law Office of Kathy Ann Terry, 12807 Jones Rd., Houston, TX 77070. (Subject property subdivision's HOA and counsel) Braewood Glen was served process via certified mail in State Court pre removal.

<u>Ken Paxton, Texas AG</u>, Consumer Protection Division, P.O. Box 12548, Austin, TX 78711-2548.

## DISCOVERY, DAMAGE LIMITS, JURY REQUEST, & VENUE

<u>DISCOVERY DATE FOR STATUTE OF LIMITATIONS:</u> Facts sufficient for accrual of Plaintiff(s) and/or homeowners' causes of actions were discovered on or after 02/24/2022.

<u>DAMAGE LIMIT:</u> Plaintiff(s) damages claims amount to above $1,000,000,000.00.

<u>JURY TRIAL REQUEST:</u> Plaintiff(s) requests a jury trial.

<u>JURSDICTION & VENUE:</u> Harris County Civil Court at Law, per the inverse condemnation claims;[6] S.D. Texas per §1983, §1985, & §1986 claims pled and entitled. All Defendants may be state eminent domain actors during relevant times alleged.

## FACTS[7]
## HL&P/CENTER POINT ENERGY

*Inter alia*, Subject property is subject to a September 16, 1966, HL&P electric transmission and distribution lines easement agreement with prior Grantors of the subdivision: C.W. Duncan *et al.* Attached. *See* HCPR File No: C423806. It is also subject to a November 18, 1977, Grantors-

---

[5] City of Houston may purport to have an interest in the property, which Defendants may or may not operate upon, and which was not duly obtained per terms of deeds, plat, and replats; HPD are Defendant(s)' co-conspirators per agreement and act in furtherance to execute harmful & illegal invasions, harassment, and operations: 42 U.S.C. claims.
[6] *See e.g.*, *Dahl v. State*, 92 S.W.3d 856 (Tex. App – 14th Houston, 12/12/2002)
[7] As necessary and applicable, Plaintiff(s) hereby incorporate by reference, all facts, allegations, and exhibits refenced or pled in this document and this document's other sections above and below, as part of this FACTS section.

Developer "Agreement for Underground Electric Service" with HL&P. Attached. *See* HCPR File

No. F538775. It is also subject to 1977 plats and replats, and a 1978 replat of a replat, which

contain reservations for the 1966 and 1977 HL&P deed-agreements.

There are no duly recorded deed-agreements for interests in subject property (Lot 17) and

its enclosed boundaries, which supersede (a) the prior reservations ("… restricted for same under

the terms and conditions of such restrictions filed separately.") clause in the plat and replats, (b)

the 1977 HL&P deed-agreement, and (c) the 1966 HL&P deed-agreement.

The 1977 Agreement has no superseding clause to vitiate the 1966 Agreement's terms and

its "Grantor's adjoining lot" clause that protects Lot 17. The plat and replats are irrelevant (a) as

they lack a superseding clause to vitiate the 1966 and 1977 Agreement's terms that benefit Lot 17;

(b) per the prior reservations ("… restricted for same under the terms and conditions of such

restrictions filed separately.") clause in the plat and replats; and (c) per Lot 17 being subject to the

1966 & 1977 deed-Agreements. *Supra*, Pgs. 4 - 6.

There are no duly recorded agreements for interests in the Lot 17 and its enclosed

boundaries, that supersede (a) the prior reservations ("… restricted for same under the terms and

conditions of such restrictions filed separately.") clause in the plat and replats, (b) the 1977 deed

agreement, and (c) the 1966 deed agreement. *Tex. Property Code Sec. 13.001*

Current homeowners were never approached to give required joint consent, nor gave any

joint-consent to any such easement rights.[8]

Ngozi never had counsel involved in any manner on the subject property, until counsel

subscribed below.[9] Hence no statute of limitations issue in this case for any causes of action

---

[8] *See*, Exhibit "**Ngozi Adimora-Nweke [8/24/2022] Affidavit on Comcast, AT&T, & CenterPoint/HL&P Matters**," Pg. 1 – 2 of 4; *See also*, *Tex. Fam. Code Sec. 5.001*.
[9] *See*, Exhibit "**Ngozi Adimora-Nweke [8/24/2022] Affidavit on NFBWA & PAS Water Line Easement Matter**," Pg. 1 of 5; *Accord*, Exhibit "**Ngozi Adimora-Nweke [8/24/2022] Affidavit on Comcast, AT&T, &**

factually pled: E.g., the declaratory judgment to quiet title, injunction, and/or claims for damages.[10]

No Defendant or non-homeowner "person" duly acquired any easement, public or mass-commercial use, or any such property rights in Lot 17 and any of the land within its fenced/enclosed boundaries, post transfer of title from Developer(s) to any subsequent homeowner, including current homestead owners. Not even City of Houston per terms of Lot 17.

***

Neither the 1978 replat, nor the 1977 agreement, nor the 1966 agreement, contained terms or showed any underground electric boxes or electric wire poles or apparatuses installed or burdening the subject property and its backyard enclosure. *See* HCPR File No. F758989.

The subject property was first acquired post erection of a single-family home, and was sold to current homeowners, in 7/23/93. Ngozi Adimora-Nweke and Ernest A. Nweke, acquired the property on 7/23/93; a day after Ngozi's husband and children migrated to the United States.[11]

---

[10] Doc. 1-6, pgs. 2 – 42, Cause 4:22-cv-03155, filed on 9/15/2022; Docs 16 & 17, Cause 4:22-CV-03155, filed on 9/20/2022.

[11] Ngozi, a marginalized American of Nigerian origin, with a thick Nigerian English accent, and health care professional, sought to acquire a home-resident for her husband and children, upon their migration to United States. Post inquiry from colleagues and others, she was advised to consult a realtor. No one advised or informed Ngozi of the need for an attorney in real estate purchases.
This was Ngozi's first home acquisition. Ngozi's realtor, a newly licensed real estate agent, advised Ngozi and managed everything via her agent-brokerage firm. They kept Ngozi ignorant of the need for counsel involvement.

The realtor located the home; owned by the Stephensons at that time. The Stephensons were eager to sell without much delay, and Ngozi's realtor was eager to secure a closing and payment commission. Ngozi noticed all parties of her intent to acquire the property for family residential purposes, with closing and possession to occur on/day of arrival of her pending migrating husband and children; and immediately take possession same-day, vs. apartment living.

The Stephensons were also not represented by counsel in the transaction. There was a lender-mortgagee in the transaction. Documents were prepared; Ngozi signed all documents as instructed at closing, including the 1993 survey; and the family immediately took possession as planned. Hence Ngozi and husband were never suspicious as to need for any counsel involvement.

Ngozi secured and always maintained lender-mortgagee tax and insurance escrow services, to negate the possible encumbrance or risk known or disclosed to her. She never had counsel involved, nor knew of any need for an attorney, in regards to the subject property. Hence, Ngozi always understood her mortgagee as her "representative" in matters involving the subject property.

The 7/23/93 acquisition survey mentioned the 1977 HL&P easement (HCPR File No. F758989), and contained the drawing of the 80ft easement from the 1966 HL&P agreement. Yet neither the survey, nor the 1978 replat contained or showed a HL&P telephone pole or underground electric box on the subject property; nor does the 1966 & 1977 HL&P agreements, or the 1978 replat terms, allow for such. Grantor-Developer did not agree, protected and specifically negated such a covenant to run with the land.

Also unknown to Ngozi, who lacked counsel, an illegal HL&P underground electric box, non-existent in the 1978 recorded replat, nor allowed per the 1977 or 1966 HL&P agreements, inconspicuously appears in the 7/23/93 acquisition survey.

As of 2022, there now exists multiple underground electric storage boxes, an electric pole, and more, in the enclosed backyard boundary of the private residence. Homeowners or residents do not know when HL&P or their successors or assigns accessed the property and installed the electric storage boxes, electric poles, and more on the property for commercial or public use; nor did HL&P or their successors duly comply with notice, consent, due process, and just consideration requirements with Grantors or current homeowners and the subject property. No agreement.

Per the terms of the 1978 recorded replat, the 1977 HL&P agreement, and the 1966 HL&P agreements, Grantors-Developers specified the easement authority and scope conferred, and specifically did not agree for subsequent purchasers to be bound to HL&P's activities on the subject property's enclosed boundaries – e.g., installing and operating hazardous underground electric boxes, electric poles, etc.

The 1977 HL&P agreement was entered into before the 1978 recorded replat, and by different persons. Per IIIB, HL&P's underground electric service easement, was supposed to be at the rear property lines – i.e., rear end of the subject property fence.

The utility easement strip (i.e., 16 ft utility easement) on the plat and surveys that runs across the backyard of the subject property was unreasonable per, and since the 1977 agreement. Per the 1978 replat, lots 1 – 16 are unburdened by said 16ft utility easement, and have said 16ft utility easement beginning from the end of their backyard fence line. The subject property has a bigger backyard, hence an extended portion for its rear fence line.

The non-property fence line 16ft utility easement burden across the subject property's backyard, was an "additional easement" under IIIB: "... and such additional easements as may be required for its underground distribution system will be located at such points as the underground system reasonably requires..."

Additional Easements authority is "limited" per III(C) of the 1977 agreement; binding on only on the Developer, and not subsequent purchasers: "...**however, this paragraph is intended to create an obligation binding only on the Developer and the same is not to be construed as creating a covenant running with the land or as binding on subsequent purchasers of the lots in Braewood Glen Subdivision, Section 7.**" Hence, HL&P must get consent and pay royalties to subsequent purchasers or homeowners to have the "additional easement" (i.e., non-property fence line 16ft easement across the subject property backyard).

The plat and replat's aerial easement grant language does not grant HL&P or anyone any additional public utility easement over, across/ground, or underneath public utility easement, *in perpetuity*, that burdens the subject property or its backyard. Any public or such use easement or lease rights that affects Lot 17, all require actual knowledge and consent (e.g., consideration) by the homeowners. Simple. None was ever duly given by prior or subsequent Lot 17 homeowners.

HL&P/Center point have always known they was not agreement or HL&P rights as to the non-fence bordering 16ft public utility easement area on the subject property. HL&P have been

illegally[12] adding more hazardous materials in unauthorized areas in the subject property without homeowner knowledge or consent, and illegally evading consideration: HL&P have long been committing fraud-in-factum as to the subject property.

In order to have the non-fence line 16ft easement that runs across the subject property, and in order to put any poles, underground electric boxes, etc., on said area, HL&P must provide consideration and compensation (e.g., royalties) to Lot 17 subsequent purchasers.

Note: Developer and prior homeowners were aware, and kept or planted tall pine trees in the subject property border, approximately 8 ft apart each, to knowingly obstruct any lines or poles on any unknown or unrecognized easements areas in the subject property's backyard (e.g., the 16ft non-fence easement across the property). Two of the pine trees perished in 2009 and 2018 hurricane, and were removed by current homeowners. HL&P/CenterPoint, without knowledge or consent or payment of consideration, has moved their power lines and equipment further into the subject property backyard to illegally block the areas where the pine trees used to exist, and unreasonably and illegally access and use (e.g., install underground electric boxes, transmission poles and wires, and more) the non-fenced limited prior 16ft UE easement area that runs across the subject property's center backyard, without paying any damages or royalties.

Note: The 1993 survey charting of the ariel easement is wrong and/or another evidence of fraud, improper influence, or illegal collusion with HL&P; to fraudulent acquire more land or rights and harm homeowners' rights, health, safety, and investment returns. The adjacent ariel easement does not, or should not burden Lot 17.

---

[12] *"Wrongfully, knowingly, intentionally, maliciously, fraudulently deceptively, with conscious or deliberate disregard for the rights, health and safety of the titleholders, residents, or their guests or invitees,"* and/or *"with conscious advantage-taking mindset, motive, or plot,"* and/or *"despite the known or reasonably foreseeable risk that the wrongful actions violate Plaintiff(s) and/or homeowners rights, and cause or subjects them to serious and/or unreasonable harm,"* are hereby referred to collectively, and separately when applicable, as "illegally."

Note: The 1993 and 2009 surveys should not chart the 16ft UE across the property as running with the land. The strip that extends into and across the backyard of the subject property is the non-fenced "additional easement" area that requires payment from subsequent purchasers. Any indication otherwise is wrong, and/or another evidence of fraud, improper influence, or illegal collusion with HL&P; to fraudulently acquire more land or rights and harm homeowners' interests.

There is also an underground electric box, shown in the 1993 survey, that is missing in the 2009 survey. There are underground electric boxes now discovered to exist on the property, along with the introduced electric pole. Homeowners do not know when these appeared or were moved, nor consented, nor receive(d) any consideration (e.g., damages and royalties) before, during, or after their installations or operations.

### COMCAST & AT&T

There are no telecommunications easements or leases on the subject property per the 1978 replat, nor any telecom easement or lease agreements that affect the subject property's enclosures.

When telecom became widespread consumer used in the mid-1990s, HL&P/CenterPoint's electrical underground lines and boxes, illegally installed and illegally operated in the backyard of the property, illegally attracted telecom companies such as Comcast and AT&T into the backyard.

### Comcast

Years ago, Ngozi returned home from work in the day-time to unexpectedly see men in unique work-jacket uniforms jump from outside the backyard fence of the enclosed subject property, into the backyard of the subject property.

Upset and scared, Ngozi asked them who they were, and one individual said "Comcast" were on the property to work. Ngozi demanded authorization and work permit to be on the property, and none was provided. Ngozi then asked them to leave immediately, and they left.

Ngozi did not follow through with Comcast since the work-men did not provide a name or

identification to use for a complaint; as they may have been from any company.

On 2/24/22, Comcast contractors arrived on the property again, without due notice or identification. The Comcast contractors sought to access the property, alleging they had work to do on the property. Comcast is not a telecom service provider on the subject property.

Ngozi refused to allow them on the property, so they threatened police force to access the property. Counsel below intervened, and took charge. The contractors repeatedly pointed and demanded access to an AT&T illegally installed equipment, illegally installed behind HL&P's illegally installed transmission pole and electric box located in the property's enclosed backyard.

Ultimately, after two days of hostility, i.e., dealing with the Comcast contractors and their Houston Police Department co-conspirators' attempts to intimidate the subject property homeowners and residents, and illegally force their way into the home, counsel discovered that Comcast, acting without due notice, consent, due process, nor providing just consideration or compensation to homeowners, illegally installed and operate hazardous telecom equipment and underground wire-cables that run through or affect the subject property's enclosed boundaries.

Amongst others, Comcast's cables pass through and under the enclosed backyard boundary of the subject property, and in areas of the property ungoverned by any required easement or lease agreement for such commercial or public use activity. The hazardous cables and equipment installed provide cable and internet services to Comcast subscribers.

The Comcast contractors were not authorized to enter the property for their work in Feb 2022; as the equipment they sought to service was installed outside the fence, but with connecting cables that run through and under the subject property's backyard enclosures. Said Contractors also lacked and failed to provide proper identification upon their original arrival. It was a discrete illegal job/attempt by Comcast and its contractors, acting with HPD's support.

Upon notice of such wrongful activity around 2/24/2022, and after dealing with Comcast, its contractors, and HPD's conspired attempts to (a) intimidate the property homeowners and residents, and (b) achieve illegal forced entry unto the property, counsel officially noticed and engaged Comcast's counsel.

After the February 2022 notice to Comcast and their legal counsels, Comcast and its contractors illegally accessed the property subdivision, and illegally installed a second harmful operating equipment.; still without required notice, consent, or agreement from homeowners.

Comcast illegally, invidiously, insidiously, and vindictively installed and operate said 2nd unit-equipment – so close to the backyard fence of the property, and so close to CenterPoint's illegally placed pole and one electric box unit – that they damage the property, impede property maintenance, and harm the rights, health and safety of its homeowners, residents, and guests.

Comcast installed the units in a vindictive, invidious, false, deceptive, fraudulent, manner and location on the subject property, to (a) evade noticing the homeowners and residents of the intended and actual harm caused them, caused their rights, and caused the property; (b) illegally damage the subject property; (c) evade paying any compensation or damages; and (d) further harm the homeowners, residents, and their guests' rights, health, and safety.

Comcast has since also failed to maintain its equipment(s), to the extent that their operation poses a health and hazard risk to the subject property's homeowners, residents, and guests.

## AT&T

*Inter alia*, AT&T does not have an easement or lease agreement for their mass commercial or public use on the subject property. Yet AT&T, acting without due notice, consent, due process, nor just consideration and compensation to homeowners, illegally installed and operate hazardous telecom equipment and underground wire-cables that exist on the property's enclosed boundaries – hidden behind HL&P's electric pole. AT&T's telecom unit's cables also runs through and affect

11

the property's enclosed boundaries.

The property's homeowners and residents did not know when AT&T installed the equipment on the property, nor are they duly noticed when AT&T enters the property to maintain, or operate the AT&T equipment on the property.

AT&T is the internet and/or cable service provider on the subject property. Yet the services provided via equipment in the property's enclosed backyard is not exclusively for the subject property and its residents, but for commercial mass or AT&T's subscribers. No mass or public use authorized AT&T on the property.

When counsel engaged Comcast's legal team in late Feb 2022, counsel also noticed AT&T's counsel of the illegal equipment in the backyard. Over the following months, AT&T invidiously and insidiously made their violation clear – that the unit in the backyard was not exclusive for the subject property. AT&T continuously sent technical staff to the subject property to conduct maintenance of cable and internet services for other AT&T subscribers. Hence, homeowners and residents discovered that AT&T's equipment was not exclusively for Ngozi's AT&T subscription, but for AT&T's many subscribers.

Sometimes AT&T staff come on the property and demand access to the backyard and the AT&T unit, where one of HL&P's underground storage electric box exists; without due notice or consent, and/or in an aggressive or hostile manner; to service other subscribers. When asked to leave, the staff would threaten to call HPD on homeowners or residents.

AT&T's illegal operations on the property, for the benefit of AT&T and other subscribers, is a hazardous risk and harm to the rights, health and safety of the property's homeowners, residents, and guests. For example: On some occasions, AT&T's staff would come on the property to address the homeowners' issues, re-route the wire cables, and leave them exposed on the ground.

Amongst others, such hazardous operation activities damaged the property, and deterred or impeded property maintenance. On other occasions, AT&T would send hostile staff on the property to address other AT&T subscribers' maintenance issues. The hostile staff would instead disconnect the services for other AT&T subscribers. Hence, AT&T would send another staff to the property to fix either the latter issue, or both issues. Such required someone (e.g., counsel subscribed below), to always be present on the property.

Amongst others, Plaintiff discovered that the subject property, a private property, was being forcibly, invidiously, and insidiously turned into mass commercial or public use property riddled with hazard, risk, harm or losses carried by/forced upon the homeowners, residents, and their guests; without knowledge or consent of the homeowners, residents, and invitees; and without required notice, Plaintiff(s)-homeowners' equally protected due process/condemnation proceedings, just consideration, or compensation paid.

Amongst others, Plaintiff discovered that AT&T and/or Comcast's telecom illegal equipment and operations, also severely harmed the privacy, security, finances, and personal and business matters of the homeowners, residents, and guests; as some work from the home.

### NFBWA[13]

In the 1940's as City of Houston expanded, City of Houston development officials anticipated the further growth of Houston, and secured water rights from all surrounding sources. As Fort Bend County subsequently developed, they lacked access to water. NFBWA, a taxing entity, was duly organized and charged with water provision for Fort Bend County residents. Fort Bend and/or NFBWA entered into an agreement with City of Houston, to acquire water for daily

---

[13] Additional necessary or material FACTS are on file in attached **Ngozi Adimora-Nweke [8/24/2022] Affidavit on NFBWA & PAS Water Line Easement Matter;" "Ngozi Adimora-Nweke Affidavit on Comcast, AT&T, & CenterPoint/HL&P Matters;"** and **PLAINTIFF'S ORIGINAL COMPLAINT EXHIBITS**; all filed via CD along with their supporting Exhibits/evidence. *See*, **Doc. 27**, Cause 4:22-CV-03155, S.D. Texas, Houston, Division.)

use which is transmitted through pipelines via pump station across the street from subject property.

The subject property and subdivision, is located at the end of Harris County and City of Houston. NFBWA built pump stations on the other side of Bellaire Road, across the street from the subject property; and after 2009, illegally, and without knowledge, consent, good faith offers, agreement, condemnation suit, or compensation (e.g., damages and royalties), installed water pipelines that run through a material portion of the subject property to provide Fort Bend County residents with water for daily use/consumption.

*Inter alia*, NFBWA and PAS agreed to, and acted in furtherance of their agreement, to deprive Plaintiff(s) of equal protected personal and property rights, and due process rights. Really, all Defendant(s) did such really.

Sean Patrick Kennedy of PAS, acting in conspiracy (i.e., in agreement and in furtherance of the agreement) with Steve Bonjonia of PAS, & both acting on behalf of PAS and NFBWA, and in conspiracy with PAS and NFBWA executives, counsel(s), & staff, forged a counteroffer letter on Ngozi's behalf, purporting an offer to sell or purchase property rights for $1000. (Exhibit 6)

The homeowners nor counsel, knew nothing about any $1000 offers or counteroffers. The 12/2/2009 dated letter instructed Ngozi as follows, presumed as terms of acceptance:

"Please have the enclosed easement signed and the original returned to our office for recordation. There is also a w9 attached which needs to be singed and filled in with the correct information and sent to us with the original easement. Once we receive the original documents back fully executed, Property Acquisition Services will request funds from North Fort Bend Water Authority...."

On 12/4/2009, NFBWA &/or PAS's Steve Bonjonia and/or Sean Patrick Kennedy, dispatched the fraudulent 12/2/2009 PAS & NFBWA counteroffer letter, with a blank copy of the forged recorded document, and a blank W9 form, via U.S. Post office, to Ngozi Adimora-Nweke and her son, Ernest Adimora-Nweke, at the subject property.

On the evening of the same 12/4/2009, NFBWA &/or PAS personnel, Bonjonia, drove to

14

the subject property, arrived in the backyard, again disclosed himself to Ngozi and Ernest A. Nweke as a government agent acting for NFBWA, and told the homeowners that the government mandate process/procedure was (1) that they had to sign the document (a) in order to be in compliant with the law, and (b) in order not to lose their home; and (2) that he would return later to work out any details as to valuation and payment.

Bonjonia presented only the signature page was presented to Ngozi and her husband Ernest A. Nweke, when he had them signed it in the backyard of the property, the evening of 12/4/2009. Bonjonia went on the property alone. There was no notary present. The homeowners were not given reasonable or any opportunity to read the signed document before signing it, nor was the document notarized before them, nor was it notarized or recorded with their knowledge or consent.

Neither Ngozi, nor her husband Ernest A. Nweke, nor their son Ernest Adimora-Nweke, have ever met Sean Patrick Kennedy. In Dec-2009, Ernest Adimora-Nweke, was in Lubbock, TX; ignorant of the fraud activities against his parents. Ernest A. Nweke's driver's license, passport, or official IDs, never stated/states "Ernest Adimora-Nweke."

When PAS' 12/2/2009 letter with the blank version of the recorded 12/4/2009 document, and blank W9 form arrived in the mail, Ngozi signed the document only to comply with the law as warned or instructed – without knowledge of its contents, and kept awaiting Steven Bonjonia's return to continue negotiation, valuation, finalize the agreement and payment; as he had promised.

Steve Bonjonia never returned as promised. Ngozi never heard from his again, nor heard anything about NFBWA or the water line easement matter thereafter; not from NFBWA, PAS, their agents, her husband Ernest A. Nweke, or anyone. Ngozi therefore never raised nor discussed the water line easement matter with her husband; nor signed and returned either the water line easement document or the W9, as instructed. Ngozi discretely kept all mailed documents and

continued to await Steve Bonjonia's promised return; which never occurred.

Neither the homeowners nor the residents of the subject property were aware that the 12/4/2009 document was eventually signed by PAS or NFBWA or a notary. They were also never aware that the 12/4/2009 document was eventually recorded on their property.

Neither Ngozi nor her husband were provided any copy the document they signed on 12/4/2009, nor were they provided a copy of a NFBWA-executed version of the 12/4/2009 document, nor were they provided a copy of the recorded version; nor were they provided any notice of such false/fraudulent activities. There was no other contact or communication with Ngozi after 12/4/2009 on the water easement matter regarding the subject property.  Rather, NFBWA mailed Ngozi was a vague or general advertisement around April 2010 (Exhibit 7).

Neither the homeowners nor residents were aware that NFBWA and/or their agents eventually did install a water line easement on and through the subject property; until around late April 2022 - when counsel/Ngozi's son, Ernest Adimora-Nweke, was physically approached by a NFBWA operations staff, in the subject property backyard, and told that the homeowners (Ngozi and husband, and family) will have to move the property fence due to NFBWA's alleged ownership and ongoing water pipeline under the property, used to provide all Fort Bend with water.

Counsel immediately searched and contacted NFBWA counsel, who provided counsel with copies of the unknown, unconsented, and falsely recorded 12/4/2009 document (Exhibit 8); and subsequently, a copy of a criminal fraudulent $1000 invoice dated 12/04/09 (Exhibit 9), signed by Ngozi's husband under duress and anxiety on 12/30/09, and unknown to Ngozi or counsel until 4/12/2022. Ngozi neither signed nor endorsed the $1000 invoice document, or any valid document on the matter. *Inter alia*, Ngozi was kept ignorant of all activities on the matter after 12/4/09.

NFBWA and their counsel still deem Ngozi's son as Ngozi's husband or co-homestead

owner, and the signatory on the forged recorded 12/4/2009 document.  (Exhibit 10)

NFBWA admitted it cannot provide counsel or Ngozi with a copy of any check endorsed by Ngozi and her husband, that shows any receipt of any payment or consideration from NFBWA, PAS, or anyone on the water easement matter.  (Exhibit 11) They provided a front copy of drafted check for $1000, but cannot provide the back copy – needed to prove any joint agreement, receipt by homeowners, or endorsement by Ngozi and her husband.

No one orally informed homeowners of their right to counsel on the matter; nor provided them with fair opportunity to obtain counsel on the 12/4/2009 document; nor reasonably informed them of their rights, including entitled equal protection and due process right to a proceeding in an impartial tribunal.  There were no good faith offers, no agreement, no condemnation suit, nor any due process, consideration, or compensation with/from NFBWA or PAS; or any Defendants.

None of Ngozi's mortgagee-lender(s) was/were ever actually noticed, informed, nor provided consent to any of the challenged or complained-of activities on the subject property backyard.  Current homeowners were never actually noticed, informed, nor provided consent to any of the challenged or complained-of activities on the subject property backyard.

## ARGUMENT & CAUSES OF ACTION

All contents in the above and subsequent sections, are hereby incorporated by reference.

Amongst others, there lacks any valid water-line, electric, or telecommunications easement[14] or lease agreement on the subject property, nor any intent of Grantors or homeowners to perpetually burden the private enclose boundaries of the subject property. *See* HCPR File No(s): F758989; Vol. 277, Pgs. 124 – 130 (09/08/1978) ("A Replat of A Replat of Braewood Glen Section 7."); *See also*, HCPR File No(s): C423806 (12/19/1966), & F538775 (04/03/1978).

Defendants, all at various times, and without any right, due process such as good faith offer,

---

[14] Easements in Texas (tamu.edu); https://assets.recenter.tamu.edu/documents/articles/422.pdf

17

consideration, agreement, condemnation proceedings, knowledge or consent from Plaintiff(s), or authority, illegally agreed to, and acted in furtherance of their agreement to continuously entered and/or installed their electrical, water-line, or telecommunications equipment in the enclosed backyard of the subject property, for public use or Defendants' commercial benefit from services to consumers, without the various necessary or required notices, or condemnation proceedings, or damages and royalties compensation due Plaintiff(s) and/or homeowners; and did so without Plaintiff(s)' knowledge, consent, any required due process, good faith offer, or agreement; all to Plaintiff(s)' detriment/harm. All DTPA pre-suit notices were sent on 4/2022 upon claim discovery.

The subject property is uniquely located, with a huge backyard that extends further than any other in the subdivision. The extension component, due to its location, always had major financial value or benefit for Defendants and Plaintiff(s). Defendants have continuously sought to marginalize Plaintiff(s) and illegally deprived Plaintiff(s) of their financial benefit. Yet no Defendant pays property taxes on, nor maintains the subject property, or any of the disputed areas.

Plaintiff(s) have incurred losses including pain and suffering, mental anguish, medical expenses, loss of income and/or royalties, loss of income and/or royalty opportunities, reputational injury, embarrassment and humiliation to person and name including family name, harm to business and profession, property damage, fees, costs, and more, caused by the Defendant(s) wrongful illegal actions; and any of Plaintiff(s) justified reliance on false or illegal actions.

### HL&P/CenterPoint, AT&T, & Comcast & Contractors, Executives & Employees Fraud-in-factum, fraud in the inducement, DTPA, Inverse Condemnation, Premises Liability, Slander of Title, Quiet Title, Invasion of Privacy & 42 USC §1983; §1985(2); §1986, & violation of Texas Property Code

HL&P/CenterPoint, AT&T, & Comcast, acquired no rights in the subject property, and knew they had no rights or agreement in support in the subject property. They each at different times, sought to deny Plaintiff(s) and homeowners of their equal protection and due process rights,

including right to just damages and royalties from the property. They also sought to, agreed, and acted in furtherance of their illegal agreement for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in Texas, with intent to deny to Plaintiffs and homeowners the equal protection of the laws, or to injure them or their property for lawfully enforcing, or attempting to enforce, their rights – including right to civil and criminal redress of harm caused them – and that of others subjected to the property and the wrongful illegal actions, to the equal protection of the laws.

HL&P obtained a private easement agreement from prior Grantors through fraud; and since 1966 and through recently, have continued to violated the terms of their fraudulently obtained agreements for the subdivision, and have continuously and illegally defrauded and/or illegally evaded paying consideration, royalties, and/or damages due the titleholders or Plaintiff(s).

When telecom became widespread consumer used in the mid-1990s, HL&P/CenterPoint's electrical underground lines and boxes, illegally installed and illegally operated in the backyard of the property, illegally attracted telecom companies such as Comcast and AT&T into the backyard.

Neither Comcast nor AT&T has any of the legally required applicable easement agreement with any of the subject property Grantors or homeowners, to install or operate any of their cable television and internet equipment on the subject property for public use. AT&T's equipment is located next to HL&P's transmission lines pole and one of the electric boxes in the backyard. AT&T installed their cable and internet equipment, discovered to be a premises hazard with electrical wires inside, hidden behind HL&P's pole in a subtle and deceptive location – unable to be seen by anyone on the subject property, unless they examine further down its extended area.[15]

Comcast, amongst others, illegally installed and still operate two telecom cable and internet

---

[15] Note: AT&T is the current internet and tv cable service provider on the property. The unit is mass commercial use.

19

units, with telecom cables that pass through and under the enclosed backyard boundary of the subject property, and in areas of the subject property where there is no easement or lease for such ground wire cables, without any good faith offers, no condemnation proceedings, etc.

Upon notice of such wrongful activity around 2/24/2022 and after, counsel noticed and engaged Comcast and its legal counsel.

Amongst others, after the first February 2022 notice to Comcast and their legal counsel, and without proper required knowledge, consent, or agreement from homeowners, Comcast and its contractors illegally accessed the property subdivision and illegally installed and still operate a second telecom unit, installed and operated right so close to the backyard fence of the subject property, and close to CenterPoint's illegally placed pole and electric box unit. Comcast installed the unit in a false, deceptive, fraudulent, manner and location to evade notice to the homeowners of the subject property; to illegally damage the subject property and the homeowners, residents, and their guests' rights, health, and safety; and to evade paying any compensation or damages. Comcast's 2nd unit recently illegally installed after the 02/2022 notice to their counsel, affects or harms maintenance or replacement of the fence.

AT&T, HL&P, & Comcast's wrongful and illegal operations on the subject property, also continuously pose a serious flagrant or unconscionable risk and harm to Plaintiff(s), and causes serious premises health and safety danger and harm to the subject property, its residents, invitees, homeowners, and all exposed to the property – e.g., Plaintiff(s). None had the required or legal consent for their operations on the subject property; none went through any condemnation proceedings to acquire any rights or consent to the property; none have operated in any reasonable, to show they have any colorable rights to the property (e.g., fair/required/reasonable notice to homeowners before entry or operations on the subject property). Rather, they have continuously

operated in a flagrantly false, fraudulent, and deceptive manner that shocks the conscience, and seriously harms Plaintiff(s) and their rights; including by subjecting them to unconsented and unreasonable continuous risk, liability, liability exposure, and/or financial harm via evading paying due compensation (e.g., damages and royalties).

Amongst the flagrantly wrongful electric and information security hazard posed by AT&T, HL&P, & Comcast's illegally installed and operated electric and telecom units/equipment, in or dangerously close to the enclosed backyard of the 6826-subject property, which causes Plaintiffs serious continuous damages and risk of harm, Plaintiff(s) also continuously endure the wrongfully imposed or caused risk, hazard, and harm to the subject property, Plaintiff(s), and their rights, all caused by Defendants' wrongful and illegal actions, including any of Plaintiff(s) justified reliance.

Plaintiff(s) and or homeowners have incurred various losses including but not limited to pain and suffering, mental anguish, medical expenses, loss of income and/or royalties, loss of income opportunities or royalties, reputational injury, embarrassment and humiliation to person and name including family name, harm to business and profession, property damage, fees, costs, and more, caused by the various wrongful actions of Defendant(s) and their agents and executives; including the entities' customs and practices that allowed for such illegal harmful activity (e.g., their failure to supervise staff, contractors, or agents; failure to screen executives, staff, contractors, or agents; their failure to retain qualified executives, staff, contractors, or agents; and their executives, counsels, managers, and/or supervisors' failure, neglect or refusal to prevent the continued wrongful-illegal activity and harm against Plaintiff(s)) all basis for federal claims.

### NFBWA & PAS & Contractors, Executives, & Employees
### Fraud-in-factum with Forgery, Fraud in the inducement if applicable, DTPA, Inverse Condemnation or Texas Property Code Violation, Quiet Title, Premises Liability, Slander of Title, Invasion of Privacy, Defamation/False Light, & 42 USC §1983, §1985(2), & §1986

Defendants NFBWA and/or PAS acquired no rights in the subject property.   With

deliberate indifferent to Plaintiff(s) rights, health and safety, they invaded and continue to illegally exist and operate on the subject property, without paying any just compensation – including royalties – to the homeowners.  Their existence and activity under these circumstances poses a risk or danger to homeowners and residents' rights, interests, health, and/or safety.

Defendants NFBWA & PAS illegally obtained the subject property's current homeowners' signatures on a forged and recorded document obtained via fraud-in-fact, Inst. FC# RP070142867 (*See also*, HCPR File No(s): 20100037723); for a water-line/water pipeline that must and does run through the subject property's enclosed backyard.[16]

NFBWA and PAS, acting though their executives and agents, illegally obtained Plaintiff Ngozi's signature on the signature page of an unread, incomplete, unnegotiated, and unsigned 12/4/2009 document.  The same Defendants NFBWA, PAS, and their executives and agents later forged and recorded on the subject property as Inst. FC# RP070142867, without Ngozi's knowledge or consent, without due process due to Ngozi and homeowners, and without Ngozi or her husband's knowledge or joint consent to the terms of the forged Inst. FC# RP070142867.

E.g., The forged deed, Inst. FC# RP070142867, was not notarized before Ngozi and her husband.  They never consented to the notary of any NFBWA or PAS recorded document.

Neither Ngozi nor her husband, Ernest A. Nweke, nor counsel, have ever met Sean Patrick Kennedy, the notary of the forged deed; Inst. FC# RP070142867.  Sean Patrick Kennedy, the notary of the forged recorded deed, is an agent or employee of PAS, a private entity acting as contractor for NFBWA, a government entity, and a real estate agent, at the time of the forgery. He was not an independent third-party to the transaction, nor a required licensed real estate broker.

---

[16] The document is forged under Texas Penal Code §32.21(a)(1), and is evidence of fraud-in-fact because, *inter alia*, there was no agreement between the homestead of the subject property (i.e., Ngozi and Ernest A. Nweke) and NFBWA nor PAS, in regards to any property rights, interests, or water-line easement on the property.  Furthermore,

NFBWA and its executives, fraudulently, knowingly and intentionally engaged an illegal an unlicensed PAS entity and its corrupt team to try and secure the subject property and water-line easement rights, without due process and proper compensation due homeowner-Plaintiffs.

The forged deed with Inst. FC# RP070142867, amongst others, is *prima facie* proof of defamation and fraud-in-factum. Amongst others, the unread or un-negotiated forged deed bears Plaintiff-counsel's name: Ernest Adimora-Nweke, and Plaintiff-counsel's mother's name: Ngozi Adimora-Nweke, as his wife. Such is clearly libel – false and illegal incest relationship between mother and son.[17] The subject property is a homestead property jointly owned and held by Plaintiff-Ngozi, and her husband, Ernest A. Nweke, Plaintiff-counsel's father. Ernest Adimora-Nweke was away in law school during this period, unaware of NFBWA & PAS' illegal and harmful actions on subject property, his parents, himself; and their liberty and property rights.

Just as his parents, Plaintiff-counsel Ernest Adimora-Nweke, has also never met Sean Patrick Kennedy; and also, never saw the forged deed until April 2022. No Plaintiff(s) or homeowner, or resident of the subject property, ever saw the forged deed, or ever knew of any water-line installed on the property until, April 2022.

Ngozi never agreed to any amount for valuation or as compensation for the water-line easement. She rejected all their offers and valuation methods. Ngozi never agreed to NFBWA or PAS' price offers nor agreed to their valuation method. Neither NFBWA or PAS paid any money,

---

[17] Such statement on the forged deed, and in NFBWA's 2022 write-up still holding Ernest Adimora-Nweke as the signatory on the forged deed, is an unauthorized and flagrantly false/invidious statement of fact and flagrantly false/invidious implications in regards to the property owners, the mother-son relationship of Plaintiff(s), the homeowners' husband and wife relationship, and the family name and family member's known normal and respectable co-relations to each other; illegally published on a public deed and to various other third parties; that tends and did harm all Plaintiff(s) and homeowners, family members, businesses and property's reputations, value, and liberty; and amongst others, was and is maliciously or illegally done and continued, with knowledge that the statement is false or with reckless disregard as to its falsity, and with knowledge of the harm that it will and did cause Plaintiff(s), homeowners, the family members, the property, their businesses, reputation, income and income opportunities, rights – e.g. liberty and privacy rights, health, and safety, etc.

or provided any valuable consideration – e.g., $10, $1000, or anything – to any of the subject property/homestead's joint-homeowners before, on, or after 12/4/2009. Ngozi never received any money or payment from PAS or NFBWA for the water-line easement; nor did she ever agreed to any of their terms, including price or valuation, for the water-line easement at any time.

Neither PAS, NFBWA, or any of their executives or staff, ever orally, clearly/inconspicuously, or reasonably informed the subject-property homeowners/residents, including Ngozi, of their right to effective counsel assistance, or of their right to a hearing to contest PAS and NFBWA's actions via due process condemnation suit/proceedings entitled them.

To deceptively secure their signatures on the forged deed's signature page with intention to harm Plaintiffs, NFBWA, PAS, and their personnel leveraged false representations, deception or deceptive trade practices, intimidation, and coercion.

Amongst others, Mr. Bonjonia arrived on the subject property backyard on 12/4/2009, and disclosed himself as an agent of the government. After intimidation and coercion of the homestead owners, he presented Ngozi and her husband with the signature page of the pre-drafted, unread, un-negotiated, and unconscionable 12/4/2009 document, and falsely represented to them that, *inter alia*, (a) they were mandated by the government to sign the document; (b) they had no choice but to sign the document as it was government required; (c) that the process for the transaction was that after they sign the document he would later return and resolve any valuation or compensation issues, and resolve any other details the homeowners' have as their concern on the matter; and (d) that if they refused to sign, they would not be complying with the law, and the government will still take their property. Neither Ngozi nor her husband ever read nor understood the forged recorded deed before signing it, nor had a fair opportunity to read the document or confer with counsel on its terms. Only Bonjonia was present in the backyard of the subject property on

12/4/2009 when Ngozi and her husband, Ernest Nweke, signed the page; *no notary*.

Mr. Bonjonia, PAS, and NFBWA agreed, plotted/planned, and acted in furtherance of their illegal plans and wrongful agreements (*inter alia*, to harm Plaintiff and evade payment of due royalties and other compensations due them), by amongst others, deceiving, intimidating, and/or coercing the homestead-owners into executing the signature page sign the forged deed's signature page the same 12/4/2009 day Mr. Bonjonia came and presented it to them, (1) without counsel's assistance, (2) without their review, knowledge, or explanation of the forged deed's contents/terms, (3) without the fair due process entitled the homeowners – e.g. condemnation proceedings, and (4) with knowledge that the homeowners did not agree and would not jointly agree to the forged recorded deed's terms.

There was never required joint acceptance of any water-line easement offer. Ngozi never received or accepted any payment on any water-line easement matter. Ngozi never knew of any acceptance of any offer, or any payment made on the matter. The homestead owners never duly received any copy of the 12/4/2009 document Bonjonia, PAS, and NFBWA had them sign its signature page on 12/4/2009; nor did they ever receive a copy of the forged Inst. FC# RP070142867 after it was signed by NFBWA or after it was recorded, until 2022.

Plaintiff(s), homeowners, and/or residents of the subject property never saw the forged document, or ever knew that NFBWA & PAS recorded the forged deed/forged document, nor knew that NFBWA installed the water-line installed on the property; until altered of the water-line existence via an invader in April 2022.

Plaintiff(s), homeowners, and/or residents of the subject property were kept ignorant of NFBWA, PAS, their agents and co-conspirators' illegal acts to harm them and their property, while NFBWA, PAS, their agents and co-conspirators benefited and profited from the illegal acts at

Plaintiff(s), homeowners, and/or residents' expense.

NFBWA, PAS, *et al*, illegally precluded or denied homeowner-Plaintiffs of entitled due process (fair notice, hearing, consideration, right to counsel assistance, and just compensation), and have illegally operated on and continuously benefited from the subject property (over $100M **profit** after all expenses and investments, in their checking account, and with the profit dollar amounts and their checking account **increasing at an increasing rate annually**), simply so to illegal defraud and deny Plaintiffs' of their constitutionally entitled personal and property rights, and illegally evade paying consideration, royalties, and/or damages due the titleholders or Plaintiff(s); all via flagrantly false, fraudulent, and deceptive manners or illegal actions that shocks the conscience, seriously harms Plaintiff(s) and their rights.

Plaintiff(s) and or homeowners have incurred losses including but not limited to pain and suffering, mental anguish, medical expenses, loss of income and/or royalties, loss of income and/or royalty or income opportunities, reputational injury, embarrassment and humiliation to person and name including family name, harm to business and profession, property damage, fees, costs, and more, caused by the various wrongful actions of Defendant(s) and their agents and executives; including the entities' customs and practices that allowed for such illegal activity (e.g., their failure to supervise staff, contractors, or agents; failure to screen executives, staff, contractors, or agents; their failure to retain qualified executives, staff, contractors, or agents; and their executives, counsels, managers, and/or supervisors' failure, neglect or refusal to prevent the continued wrongful-illegal activity and harm against Plaintiff(s)) all basis for federal claims.

*Inter alia*, (a) Defendants' other wrongful, unconsented, and/or illegal operations on the subject property with or via third-parties, (b) Defendants' illegal actions with and/or without the fraudulent documents, which they illegally allege to be valid or binding documents to illegally act

on the subject property and illegally act to harm Plaintiffs, and (c) Defendants' actions and actions in agreement with other third-parties (1) to preclude, impede, or deter Plaintiffs from notice or knowledge of their property's value, their personal and property rights, or their sustained/sustaining harm/damages, (2) to preclude, impede, or deter Plaintiff(s) from redress of their sustained/sustaining damages, (3) to evade paying due consideration, royalties, and/or damages due the titleholders or Plaintiff(s), (4) to deprive Plaintiffs of their personal and property rights, and (5) to harm Plaintiffs.  These risks, hazard, and harm include:

(1) Defendants, their agents, and/or other third parties' continued illegal invasions unto the subject property, and resulting harm to Plaintiff(s)' persons, personal rights (e.g., liberty, life, income, security, peace-of-mind, redress of harm or grievance, compensation for damages caused, etc.) and property (quiet enjoyment, privacy, exclusivity, financial value and benefit, etc.) rights, all without due consideration and compensation, without equally protected due process for Plaintiffs, without legal justification, and without due consent from Plaintiffs;

(2) illegally impeding, deterring, or affecting Plaintiffs' right to due course of justice due Plaintiffs under the laws, for them to secure due compensations for the risk, hazard, and harms sustained/endured, to the deprivations of Plaintiff(s) U.S. and Texas Constitutional equally protected 14th Amendment rights – *inter alia*, also achieved by Defendants via their continued illegal invasions unto the subject property and personal property and privacy of Plaintiffs;

(3) illegal evidence tampering, harassment, illegal intimidation, falsification and fabrication of evidence, including evidence on the subject property – *inter alia*, also achieved by Defendants via their illegal past activities and continued illegal invasions unto the subject property, the personal property and the privacy of Plaintiffs;

(4) giving and/or agreeing and acting in furtherance of the agreement with third-parties

such as Houston Police Department, City of Houston, Harris County, Fort Bend County, State of Texas, and/or their employees, and/or other wrongful minded or criminal minded third-party individuals to, *inter alia*, invade Plaintiff(s) privacy, to give unwanted publicity to private matters of Plaintiff, that are false and flagrantly wrong, and presents Plaintiff(s) before the public in a false light that would be highly offensive to a reasonable person, and to which they knew was false and flagrantly wrong, or acted in reckless disregard as to the falsity of the publicized private matters of Plaintiff(s) and the false light in which the other would be placed, all to evade due paying consideration, royalties, and/or damages due the titleholders or Plaintiff(s), and to deprive Plaintiffs of their personal and property rights, and harm Plaintiffs; and more.

Amongst others, these risks, hazard, and harm are/were also proximately or directly caused by, amongst others pled above, Defendants' deprivation of Plaintiff's rights to damages and royalties; the unconsented unreasonable false light, unconsented public exposure and invasion of Plaintiffs' privacy caused by Defendants; Defendants' fraud or forgery; Defendant's illegal operations on the subject property and in targeting Plaintiff(s); Defendants' deprivation of Plaintiffs' property rights without just compensation; Defendants' deprivation of Plaintiff's equal protection and due process rights including rights to counsel, condemnation proceedings as applicable, fair/proper valuation of their assets for damages and royalties purposes, damages and royalties compensation; and Defendants' obstruction of justice activities to cover/hide their illegal activities and cover themselves to evade civil and criminal redress – e.g. keeping Plaintiffs ignorant of their crimes to evade statute of limitations for e.g., Texas Penal Code 32.21 and 32.46 matters; and Defendants illegally manipulating the facts, evidence, and/or situation to seem as if Defendants duly had or have rights in the subject property and its backyard enclosures, or evade civil liability.

Plaintiff(s) and or homeowners have incurred losses including but not limited to pain and

suffering, mental anguish, medical expenses, loss of income and/or royalties, loss of income and/or royalty opportunities, reputational injury, embarrassment and humiliation to person and name including family name, harm to business and profession, property damage, fees, costs, and more, caused by the various wrongful actions of Defendant(s) and their agents and executives; including the entities' customs and practices that allowed for such illegal harmful activity (e.g., their failure to supervise staff, contractors, or agents; failure to screen executives, staff, contractors, or agents; their failure to retain qualified executives, staff, contractors, or agents; and their executives, counsels, managers, and/or supervisors' failure, neglect or refusal to prevent the continued wrongful-illegal activity and harm against Plaintiff(s)) all basis for federal claims.

### RELIEF REQUESTED

Plaintiff(s) ask for declaratory judgment that neither HL&P/CenterPoint, AT&T, Comcast, NFBWA, nor PAS, nor any entity duly obtained any public use or commercial rights in the subject property Lot 17, or its backyard enclosure.

Plaintiff(s) ask for Declaratory Judgment that the Bill of Rights sent Ngozi with the 6/16/2009 letters and packet (Exhibit 12), is insufficient for fair notice, and/or effectuates or results in denial of equal protection rights of citizens. It is invalid as applied in this case. *Inter alia*, the confusing Bill of Rights disclosures are unorganized, vague, confusing, and/or unreasonable as to (a) fair notice of the situation/material issues, material terms (e.g., condemn vs condemnation procedure vs condemnation action or proceedings) for a non-attorney, and/or (b) material necessary disclosure/info needed for imminent informed decision by vulnerable subject citizens (e.g., with limited resources, targeted, and/or denied a good faith offers and due process). It effectuates unconstitutional impediment, deterrence, or defeat of Plaintiff(s) and similar persons' exercise of equal protected right to counsel in such compulsory proceedings; and effectuates unfair discrimination against vulnerable, targeted, marginalized, or protected persons or class.

Also, valuation must consider best use, **use and benefit of the anticipated condemnation/public project**, and harm to the remining property. *Tex. Prop. Code § 21.041.* And, homeowners subject to Bill of Rights must be provided oral notice of their right to counsel at all times before or during any compulsory government activities or proceedings that affect their life, liberty, or property; not as NFBWA and/or PAS illegally evaded or failed to do in this case.

Plaintiff(s) ask for all/max remedies (disgorgement of profits remedy against applicable Defendants), damages (compensatory economic and non-economic damages, treble damages, exemplary/punitive damages against applicable individual or private entity Defendants, and cap buster damages as applicable), and past, present, and future royalties (30% of all profits or 25% of all revenues), entitled them in law and equity, against the various and applicable Defendants.

Plaintiff(s) ask for all/max attorney's fees & costs; & all relief allowed in law or equity; e.g., pre & post-judgment interest, injunction against illegal existence or operations, etc.

"I declare under penalty of perjury under the laws of the U.S. of America that the foregoing is true and correct, subject to typos or such errors. 11/3/2022.  /s/ Ernest Adimora-Nweke."

Ernest Adimora-Nweke
Texas State Bar Number: 24082602
c/o Adimora Law Firm
3050 Post Oak Blvd., Suite 510
Houston, TX 77056
281-940-5170 (Office)
ernest@adimoralaw.com
*Pro Se Plaintiff & Attorney for Plaintiff(s)*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above has this day, Nov. 3, 2022, was delivered to all necessary parties in this case or to the various attorneys of such necessary parties, in due course as allowed by the Court and pursuant to Fed. R. Civ. Pro.   Respectfully Submitted,

/s/ Ernest Adimora-Nweke

Jim McFarland (jmcfarland@jmlawyers.com) – Counsel for PAS, Mark Heidaker, Sean Patrick Kennedy, Steve Bonjonia; Britton Byron Harris (bharris@hhstxlaw.com) – Counsel for NFBWA; Scott Davis (sdavis@hdwlegal.com) – Counsel for CenterPoint; Rick Addisson (raddison@munsch.com) – Counsel for Comcast; Derrick Reed (derrick@srapllc.com) – Counsel for AT&T.

30

<u>Ngozi Adimora-Nweke Affidavit on Comcast, AT&T, & CenterPoint/HL&P Matters</u>
<u>State of Texas</u>                                                        <u>County of Harris</u>

Personally, came and appeared before me, the undersigned notary, the within named <u>NGOZI</u>
<u>ADIMORA-NWEKE</u>, who is a resident of <u>HARRIS</u> County, State of <u>TEXAS</u>, and makes this her
statement and general affidavit, upon oath and affirmation of belief and personal knowledge that
the below matters, facts and things set forth, are true and correct to the best of her knowledge:

The attached 2/25/2022 letter to Comcast, titled "Fraudulent Encroachment & Trespass In

My Property For Many Years By Comcast Company Without Notification or My Authorization.,"

and contents of said 2/25/22 letter (2 pages handwritten), are hereby incorporated by reference.

My homestead is located at 6826 Caddo Lake Lane, Houston, TX 77083.

I have never been approached by anyone from either Comcast, AT&T, CenterPoint or

HL&P, or by anyone acting on their behalf, in regards to either Comcast, AT&T, CenterPoint or

HL&P obtaining a commercial or public use related lease or easement on my homestead property;

or in regards to Comcast, AT&T, CenterPoint or HL&P obtaining a commercial or public use

related lease or easement on land located within my homestead property's enclosed backyard

boundaries.

I have never signed a lease or easement agreement with either Comcast, AT&T,

CenterPoint, or HL&P, or with anyone acting on their behalf, in regards to either Comcast, AT&T,

CenterPoint or HL&P obtaining a commercial or public use related lease or easement on my

homestead property; or in regards to either Comcast, AT&T, CenterPoint or HL&P obtaining a

commercial or public use related lease or easement on the land located within my homestead

property's enclosed backyard boundaries.

I have never received any lease or easement consideration or payment from either Comcast,

AT&T, CenterPoint, or HL&P, or from anyone acting on their behalf, in regards any lease or

easement rights conferred or granted to either Comcast, AT&T, CenterPoint or HL&P, which

affects my homestead property or its enclosed backyard boundaries.

I have never received any compensation, including damages or royalties, from either Comcast, AT&T, CenterPoint, or HL&P, or from anyone acting on their behalf, in regards any lease or easement rights that affects my homestead property or its enclosed backyard boundaries.

I have never received any compensation, including damages or royalties, from anyone in regards any commercial or public use related lease or easement that affects my homestead property or its enclosed backyard boundaries.

I do not know when Comcast, AT&T, CenterPoint or HL&P installed or moved their various equipment in, on, or around, the subject property's enclosed boundaries. I never gave consent or informed consent to any hazardous, commercial or public use related activities on the subject property's enclosed boundaries.

The property is no longer subject to a mortgage lien. I have never discussed any commercial or public use related leases or easements on the subject property or its enclosed boundaries with any of my past mortgagees. I pay all property taxes and insurance on the subject property. I also pay the insurance on the subject property.

Dated this 24ᵗʰ day of August , 2022

_Ngozi Adimora Nweke_
NGOZI ADIMORA-NWEKE

SWORN to subscribed before me, this day 24ᵗʰ of August , 2022.

_Sandra L. Peters_ Notary Public / Commission Expires 12-15-2024



SANDRA L PETERS
Notary ID #132827645
My Commission Expires
December 15, 2024

2 | 2

Mrs Ngozi Adimora-Nweke
6826 Caddo Lake Ln
Houston Tx 77083
Fri, Feb 25th 2022

To Comcast
Company.

" FRAUDULENT ENCROACHMENT & TRESSPASS IN MY
PROPERT FOR MANY YEARS BY COMCAST COMPANY
WITHOUT NOTIFICATION OR MY AUTHORIZATION

  In years past, I came in from work in day time
unexpectedly and saw men (in unique work Jacket
uniforms), jumping from outside my yard fence
into my back yard part of my property. Upset
and scared, I asked who they were & they said
" Comcast, we're here to work. I demanded
an authorization permit to be in my proper
and their individual work ID — None was provid
to me, so I asked them to leave immediately & they
left. I did not follow through with Comcast since I had
no name ID to use for my Complaint since it might
well have been from any Company or individuals.
  Then on Thurs Feb 24th 2022 about after 9 am Cs
a guy in unique top work-Jacket rocked at my
door. When I answered the door the guy said he
was comcast and needed access to my propert

Pg 2

to do some work. I replied: "Did your company already send me official notice in regard of your work today and for how long you'll be here? 2. Where is your work ID?" Other guys where out in my street, along with a big trailer truck carring very thick roll of yellow cables at the open back of the truck, I refused to allow them access.

Later a guy among the un-identified "Comcast" guys talked with my son. Since yesterday Feb 24th 2022 afternoon. About after 10am Frid Feb 2022 another guy in similar unique Work Jacket rocked at my door and he told me he was from "Comcast" and needed to enter my back yard to work. I asked his permission to hold on. I called my son to please come and continue with the "Comcast" guy.

To the current state, I demand that "Comcast" Company ends this trend of harrassing my Peo and fruadulently gaining access or jumping the fence into my propesty! I have Zero tolerance for such crude act from a "Big" Utility Company like Comcast.

Sincerely
Mrs Ngozi Adimora-Nweke - Retiree of State of Texas      Ngozi Adimora
- Nweke   02/25/2022

State of Texas                                                    County of Harris

Ngozi Adimora-Nweke Affidavit on NFBWA & PAS Water Line Easement Matter

Personally, came and appeared before me, the undersigned notary, the within named NGOZI ADIMORA-NWEKE, who is a resident of HARRIS County, State of TEXAS, and makes this her statement and general affidavit, upon oath and affirmation of belief and personal knowledge that the below matters, facts and things set forth, are true and correct to the best of her knowledge; and supported by recently investigated evidence, including Exhibits 1 – 11 (89 pgs.):

My homestead, the subject property in this matter: 6826 Caddo Lake Lane, Houston, TX 77083, is located around the end of Harris County and City of Houston, but within Harris County.

I acquired the property in July 23, 1993, a day post arrival of my husband, Ernest A. Nweke, and my three children, from Nigeria. My three children include my son, Ernest Adimora-Nweke. Ernest Adimora-Nweke is my counsel and attorney-in-fact on all claims and legal matters resulting on or from the subject property. I have had no other counsel involved in any matter on the property.

After I purchased the property, I was told by friends never to sell the property or I would regret it; and that the subject property's big extended backyard is highly valuable due to its location, and its being adjacent to commercial land and to Bellaire St. I couldn't comprehend.

Around February 2009, I received a mailed packet from an unknown sender. (Exhibit 1) The official 1/28/2009 dated letter contained City of Houston Planning and Development logo/header. The envelope was addressed to me alone.

I read and discussed the letter with my husband, Ernest A. Nweke, and we could not understand the contents. Stressed, confused, concerned and curious, I attended the disclosed public City of Houston meeting on the topic, on 2/5/2009, for the letter's indicated "Variance Request by North Fort Bend Water Project." I took the letter and its contents with me to the meeting. At the meeting, I showed and asked the City of Houston staff if my house will be affected by the letter's contents. City of Houston staff responded that they did not know, as they did not send the letter.

I became further confused and anxious about the unclear future of my homestead.

After the meeting, I asked homeowners on my side of the neighborhood street. None seemed to have an idea what I was talking about.

I was further stressed about the matter; as dealing with the letter and its matters also severely affected my busy schedule and obligations (e.g., taking care of my family; and my work as a Texas Dept. of State Health Services govt. healthcare professional, which involves travelling to inspect, investigate, and audit health care facilities, and authorizing grants or state funds for hospitals, clinics, institutions, and various other health care facilities. (Exhibit 11))

Around March 2009, I received an undated certified letter, addressed to me only, from North Fort Bend Water Authority ("NFBWA"). (Exhibit 2)

I understood the letter as putting me on notice of the authorities' project that may involve my homestead; rather than asking me of permission to use the property for a project that will serve another county (i.e., Fort Bend County) aside of my county or city (i.e., Harris County or City of Houston).

I was confused as to why I would be sent such a letter from Fort Bend versus Harris County or City of Houston, who provides my water and utilities. I was also confused as to what my home has to do with Fort Bend County when I lived in Harris County.

I also understood, per the letter, that I will be notified when workers need to come to work

1 | 5

on my property, and that the workers would wear personal and company identification credentials. Such has never occurred. No person displayed or provided any identification when coming to my home on this matter.

On or about middle to late June 2009, I received a 6/16/2009 dated certified letter from a Mr. Steve Bonjonia of Property Acquisition Services ("PAS"). (Exhibit 3) The letter stated that PAS, Inc. has been retained by NFBWA to assist NFBWA in acquiring a water line easement and/or temporary easement. The letter's message was addressed to me alone, with the envelope and letter contents addressed to me and my counsel-son, Ernest Adimora-Nweke.

Steve Bonjonia's letter's closing stated, "… **and we will be in contact with your representative in the near future to negotiate the purchase of the Easement.**"

Aside of the 6/16/2009 letter, the letter's envelope packet also contained, amongst others, (1) a "Texas Attorney General Landowner Bill of Rights" document that mentioned "Condemnation Procedure;" (2) Steve Bonjonia's PAS business card; and (3) what I now understood as (i) a faulty property description document, and (ii) a 2009 survey of my property.

I could not understand the 6/16/2009 packet contents. Amongst others, I did not understand what the Bill of Rights document meant. It's #9 stated, "Before your property is condemned…" I did not see my property to be "condemned" in my English vocabulary understanding.

My property was subject to a mortgage lien, who I always understood was my representative. Hence, I understood the sender of the letter would be in communication with my mortgagee-lender in the alleged easement acquisition stated in the letter. I also understood, and presumed my mortgagee would then work for the best interest of my property and valuation, and maximize the value and returns from the alleged transaction.

Without much resources or assistance, I contacted the letter sender, Steven Bonjonia, on 6/29/2009 @ 9:30am. I expressed my confusion and some of my concerns to him over the phone, and told him that I had many further questions. Steve Bonjonia agreed to come to the subject property to meet with me and my husband the same day at 6pm, and an appointment was set.

I discussed and notified my husband of the 6pm appointment with Mr. Bonjonia, and we sat down and wrote a list of some of our questions and concerns for Steve Bonjonia. The listed questions and concerns were in regards to, amongst others, property evaluation, any property devaluation resulting from the matter, any resulting insecurity and constant intrusion of outsiders into the property, damages to my farm, food plants, and trees (including pine trees) in my backyard, and more. (Exhibit 10)

When Steve Bonjonia arrived at 6pm that day, he wore no ID. He introduced himself as a government agent acting on behalf of the government, and that there was "Government mandated acquisition of easement in the property." I was confused. He told us the acquisition will occur around September 2009 (Exhibit 10), that we will work together to come to an agreement, and that he and his people will work with my representative.

Since we bought the house in 1993, and while I had a mortgage on it, I always understood my lender to be my representative in matters regarding my home.

Mr. Bonjonia was unable to provide me and my husband with clear understandable answers to our questions and concerns. I was confused, and scared for the well-being and safety of my property and my family. The supposedly government mandated intrusion into my property, for some community's benefit, caused me concern, because amongst others, it rendered my residential homestead unsafe and insecure, and caused loss of privacy issues. I asked Mr. Bonjonia if it would be better for his company to purchase the home outright, so that we can relocate to another safe and secure area. My counsel-son was in law school in Lubbock, TX at that time, away from home.

2 | 5

He graduated around May 2012. My other two children were also away from home at the time.

Mr. Bonjonia orally made an offer of ~ $320 at ~$0.3+/sq ft for the easement, stating that NFBWA's offer was so low because property was in a "low-cost" neighborhood. I felt insulted and confused. I immediately told him I did not agree, told him that I did not agree with his and his company or people's valuation, told him that there must be an independent valuation of the property, told him there must be an independent valuation of the area sought for the easement, and told him there must be independent valuation and compensation for her trees and plants.

No appraisal was ever done in this matter, nor was one ever provided to me or my husband. I keep and maintain all documents on the home. Aside of my recently conferred attorney-in-fact and counsel authority, I consent and endorse all necessary activity or documents of the homestead. I signed the mortgages since 1993, endorsed all payments, and paid the notes, taxes, and insurance.

Mr. Bonjonia never provided me or my husband with any appraisal. No one did. He did not come inside the house. Our only two physical interactions, the only physical interactions I had with anyone from NFBWA or PAS on this matter, occurred in the backyard of the home.

Mr. Bonjonia's response to my questions and concerns before he left, was that he would get back to me with more clarifications. He never did so. He never sent me an appraisal. I never received an appraisal on the matter. I have never seen an appraisal on the matter.

After the 6/29/2009 meeting, I received a 6/26/2009 dated letter in the mail from a Mr. Sean Kennedy of PAS. (Exhibit 4)

The letter's message was addressed to me alone, with the envelope and letter contents addressed to me and my son. My son was not an attorney at that time. He was in law school, and was not involved in the matter.

The 6/26/2009 dated letter contained (a) an offer of $312.00 for the easement, (b) an easement contract form with my name and my son's name already completed in the contract form, (c) the faulty property description document as sent in the 6/16/09 packet, and (d) the 2009 survey as sent in the 6/16/09 packet.

Around August or September 2009, I received another letter on the NFBWA matter; instructing me to complete and send back an attached counteroffer form: "Summary of Property Owner's Counteroffer."

I was confused, scared, anxious, felt helpless, and discussed with my husband. I did not know what to do to get an official valuation, nor had the money to pay for valuations, or had money to pay anyone to address the matter under the circumstances. Mr. Bonjonia did not communicate back on the questions we had asked him, and in regards to our concerns.

Considering it was the government instructing me, considering that this was a government required activity and they controlled the process and everything, I did the best I could.

My response was not specific as to a counteroffer. It included an unofficial valuation estimate of my plants, trees, and privacy intrusion. I also specified that the land for the easement must be independently valuated, and left that component open. I reluctantly completed, signed, and sent the counteroffer form back to PAS as instructed. (Exhibit 5)

On the evening of the same 12/4/2009, Mr. Bonjonia came to the house and again disclosed himself me and my husband as a government agent acting for NFBWA. He presented us with the signature page of a document. From what he stated, I understood from him that the mandate process was that we had to sign the document in order to be in compliant with the law, and in order not to lose the home. He stated that they (i.e., he and his company) were the government, and that they can take the home for whatever price they themselves determine.

Confused, stressed, and scared for my safety, security, home, and investment, I told Mr.

Bonjoina that I still did not agree, that there must still be independent valuation of the property and areas they wanted, and other valuations to be done.

Mr. Bonjonia responded that we had no choice at that time but to sign the document he presented, and that he would return later to work out any details as to valuation and payment.

As a government employee, I naively trusted the government and Mr. Bonjonia, and their alleged process. I signed the signature page he presented to me and my husband. He never gave us copy of the document we signed. I never received one from anyone.

The document we signed on 12/4/2009, in the backyard, was blank. There was no notary present. Mr. Bonjonia did not come with a notary. Bonjonia always came alone. The document was not notarized in front of me and my husband. I never consented to any document being notarized on the matter. I never read or negotiated any drafted agreement on the matter; nor authorized anyone to do such on my behalf. I never agreed to any terms on the matter.

I have never met Sean Patrick Kennedy. In Dec-2009, my son, Ernest Adimora-Nweke, was in Lubbock, TX; ignorant of these matters and activities. My husband's Ernest A. Nweke's driver's license, passport, or official IDs, states Ernest A. Nweke, never "Ernest Adimora-Nweke."

Bonjonia presented only the signature of Exhibit 8, to me and my husband, Ernest A. Nweke, when he had us signed it in the backyard of the property, in the evening of 12/4/2009.

We were not given reasonable or any opportunity to read the signed document before signing the signature page, nor was the document notarized before us, nor was it notarized or recorded with our knowledge or consent.

After Bonjonia got our signatures on 12/4/2009, he left with the promise to return and work out details as to valuation and payment on the matter. I never heard from him again in regards to the NFBWA water easement matter.

Days later after 12/4/2009, I received (a) a letter from PAS, (b) with a blank form agreement, and (c) a blank W9 form, all in a 12/4/2009 U.S. Post Office dated mail stamp on the envelope addressed to my son and myself. (Exhibit 6)

The PAS letter was dated 12/2/2009, and amongst others, stated "Counteroffer Accepted." It also stated that the "board of directors" determined $1000 to be amount to be paid. It mentioned no appraisal of the property and contained none.

I knew nothing about any $1000 offers or counteroffers. I made no $1000 offers or counteroffers. I did not agree to a $3000 oral counteroffer my husband made orally to Bonjonia in our backyard on 12/4/2009, and made clear to Bonjonia of need for valuations. I certainly would not have agreed to any $1000, or such amount, for any rights in the property; and never did so.

The 12/2/2009 dated letter also instructed as follows:

"Please have the enclosed easement signed and the original returned to our office for recordation. There is also a w9 attached which needs to be singed and filled in with the correct information and sent to us with the original easement. Once we receive the original documents back fully executed, Property Acquisition Services will request funds from North Fort Bend Water Authority...."

I never read the contents of the 12/2/2009 dated letter's envelope. I merely noticed it contained the signature page of the document Bonjonia had us sign on 12/4/2009, and signed its signature page in order to comply with the law – as warned or instructed by Mr. Bonjonia. I then kept it for my records, awaiting Mr. Bonjonia's return as he had promised.

I also noted in a document – which I can no longer locate – that Mr. Bonjonia said he was going to return and take care of everything (i.e., return and address outstanding issues on the matter; conduct valuation, and finalize negotiation and payment on matter); as he had promised.

Steve Bonjonia never returned as promised. I never heard from him again. I never heard from NFBWA, PAS, my husband Ernest A. Nweke, or anyone about the water line easement matter again, until 2022. I never heard anything again about NFBWA or the water easement matter, until 2022.

I therefore did not raise or discuss the water line easement matter with my husband again after 12/4/2009; nor signed and returned either the water line easement document or the W9, as instructed, per the 12/2/2009 dated letter. I discretely kept all mailed documents and continued to wait for Steve Bonjonia's promised return; which never occurred.

Neither I, nor my husband, nor any resident of this property, were ever aware that the signature page my husband and I signed on 12/4/2009, was eventually signed by PAS, NFBWA, a notary, or anyone else.

Neither I, nor my husband, nor any resident of this property, were ever aware that the 12/4/2009 signed document was eventually recorded on the subject property's property records.

I was never provided a copy the document we signed on 12/4/2009, nor was I ever provided a copy of a NFBWA-executed version of the 12/4/2009 document, nor was I ever provided a copy of any alleged recorded version (Exhibit 8; *See also*, 4/12/2022 Emailed Documents; *See also*, Harris County Property Records File No 20100037723, Film Code No: RP070142867). I was never provided any notice of any such activities by PAS, NFBWA, notary, or anyone; until 2022.

Neither NFBWA, nor PAS, nor anyone contacted or communicated with me on the water easement matter after 12/4/2009. Rather, NFBWA mailed me a non-specific, vague or general advertisement, around April 2010 (Exhibit 7).

I was never aware that NFBWA or anyone eventually did install a water line easement on and through the subject property; until around late April 2022, when my counsel-son was physically approached by a NFBWA operations staff, in the property backyard, and told my son that we will have to move the property fence due to NFBWA's alleged ownership and ongoing water pipeline operating under the extended portion of the subject property's backyard enclosure.

My son was then alerted of the issue, and immediately searched and contacted NFBWA counsel. I understand that NFBWA counsel then emailed my son with copies of the unknown, unconsented, and false recorded 12/4/2009 document (Exhibit 8); and subsequently, a nefarious, fraudulent and deceptive $1000 invoice dated 12/04/09, supposedly signed by my husband on 12/30/09 (Exhibit 9). I never knew of Exhibits 8 & 9 documents' existence, until my son received and showed them to me in April 2022. When I saw them, I was confused, anguished, depressed, and embarrassed; and feel harshly insulted, invaded, humiliated, defrauded and cheated.

I neither signed nor endorsed the $1000 invoice or document in Exhibit 9. I did not sign any agreement, invoice, or check on the NFBWA and PAS matter. I did not and still do not know the terms or contents of any agreement with NFBWA, PAS, or anyone on the water line easement matter. I did not authorize anyone to sign or record any document on the matter on my behalf.

I never authorized anyone to accept, sign or endorse any invoice, agreement, check, money order, or any payment instrument regarding the matter or the subject property, on my behalf. I was kept ignorant of all activities on the water line matter after 12/4/09.

I never received nor accepted any money from anyone, regarding the water line easement, or any easement or lease matter regarding my property. The subject property is not for sale.

Dated this 24ᵗʰ day of August, 2022.     _Ngozi Adimora-Nweke_
                                           NGOZI ADIMORA-NWEKE

SWORN to subscribed before me, this day 24ᵗʰ of August, 2022.
_Sandra L Peters_     Notary Public / Commission Expires: 12-15-2024

SANDRA L PETERS
Notary ID #132827645
My Commission Expires
December 15, 2024

5 | 5

**<u>Ngozi Adimora-Nweke NFBWA & PAS Affidavit Exhibits</u>**

**<u>SUBJECT PROPERTY:</u>**

6826 Caddo Lake Lane, Houston, TX, 77083, Harris County; jointly owned by (H) Ernest A.
Nweke, and (W) Ngozi Adimora-Nweke, as a homestead property, since July 1993. Harris County
Property Records ("HCPR") File No(s): P358971 (07/27/1993) & U994839 (04/19/2001).

**Exhibit # – Pg. #(s)**

**Exhibit 1 – NFBWA Exhibit, Pgs. 1 – 20**

**Exhibit 2 – NFBWA Exhibit, Pgs. 21 – 24**

**Exhibit 3 – NFBWA Exhibit, Pgs. 25 – 36**

**Exhibit 4 – NFBWA Exhibit, Pgs. 37 – 40**

**Exhibit 5 – NFBWA Exhibit, Pgs. 50 – 51**

**Exhibit 6 – NFBWA Exhibit, Pgs. 52 – 65**

**Exhibit 7 – NFBWA Exhibit, Pgs. 66 – 70**

**Exhibit 8 – NFBWA Exhibit, Pgs. 71 – 81**

**Exhibit 9 – NFBWA Exhibit, Pgs. 72 – 84**

**Exhibit 10 – NFBWA Exhibit, Pg. 85**

**Exhibit 11 – NFBWA Exhibit, Pgs. 85 – 89**



**Property Acquisition Services, Inc.**

19855 Southwest Freeway, Suite 200, Sugar Land, Texas 77479

Ngozi Azlimora-Nweke and Ernest Azlimora-Nweke
6826 Caddo Lake Lane
Houston, TX 77083

 # Property Acquisition Services, Inc.

December 2, 2009

Ngozi Adimora-Nweke and Ernest Adimora-Nweke
6826 Caddo Lake Lane
Houston, TX 77083-3506

**Counteroffer Accepted:** North Fort Bend Water Authority Water Line Easement
                Parcel 01A.01 & TE

Dear Ngozi Adimora-Nweke:

The board has reconsidered the counteroffer, based on this information and other pertinent data, it has been determined that $1,000.00 is an amount that is offered to you in an attempt to settle this acquisition.

Please have the enclosed easement signed and the original returned to our office for recordation. There is also a w9 attached which needs to be signed and filled in with the correct information and sent to us with the original easement. Once we receive the original documents back full executed, Property Acquisition Serivices will request funds from North Fort Bend Water Authority.

If you have any questions or concerns please feel free to contact me at 281-343-7171.

Sincerely,

Sean Kennedy
Acquisition Specialist

Enclosure(s)

**Form W-9**
(Rev. November 2005)
Department of the Treasury
Internal Revenue Service

# Request for Taxpayer Identification Number and Certification

Give form to the requester. Do not send it to the IRS.

Name (as shown on your income tax return)

Business name, if different from above

Check appropriate box: ☐ Individual/Sole proprietor  ☐ Corporation  ☐ Partnership  ☐ Other ▶ ............  ☐ Exempt from backup withholding

Address (number, street, and apt. or suite no.)

Requester's name and address (optional)

City, state, and ZIP code

List account number(s) here (optional)

## Part I  Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on Line 1 to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a TIN on page 3.

Social security number | | | | | |

or

Employer identification number | | | | | |

Note. If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

## Part II  Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. person (including a U.S. resident alien).

Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. (See the instructions on page 4.)

Sign Here | Signature of U.S. person ▶                     Date ▶

## Purpose of Form

A person who is required to file an information return with the IRS, must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

U.S. person. Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee.

In 3 above, if applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

Note. If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

For federal tax purposes, you are considered a person if you are:

● An individual who is a citizen or resident of the United States,

● A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States, or

● Any estate (other than a foreign estate) or trust. See Regulations sections 301.7701-6(a) and 7(a) for additional information.

Special rules for partnerships. Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

The person who gives Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States is in the following cases:

● The U.S. owner of a disregarded entity and not the entity,

Cat. No. 10231X                     Form **W-9** (Rev. 11-2005)

C423806          DEC 19 66    72005 ← C 423806  LS D PD          4.95

THE STATE OF TEXAS    X
                      X    KNOW ALL MEN BY THESE PRESENTS:
COUNTY  OF  HARRIS    X

        That We, C. W. DUNCAN, MRS. LYNN C. BOUSQUET,

MRS. LINNIE D. WYNNE and J. ROBERT NEAL, all of Harris County,

Texas, MRS. MARIAN NEAL RUBEY, of the County of Pitkin,

State of Colorado, MRS. NINA NEAL CULLINAN of the County of

Dade, State of Florida, and BANK OF THE SOUTHWEST NATIONAL

ASSOCIATION, HOUSTON, of Houston, Harris County, Texas, as

Trustee under the Will of Herschel Mills Duncan, Deceased,

and as Trustee under the Will of James Robert Neal, Deceased,

and not individually, for and in consideration of TEN AND

NO/100 DOLLARS ($10.00), and other good and valuable con-

sideration, to us paid by HOUSTON LIGHTING & POWER COMPANY,

have GRANTED, SOLD and CONVEYED, and by these presents do

GRANT, SELL and CONVEY unto HOUSTON LIGHTING & POWER COMPANY,

an easement or right-of-way for electric transmission and

distribution lines, consisting of variable numbers of wires,

and all necessary or desirable appurtenances (including, but

not by way of limitation, towers or poles made of wood, metal

or other materials, telephone and telegraph wires, props and

guys), at the location and along the course now located and

staked out by the said Houston Lighting & Power Company over,

across and upon the following described lands located in

Harris County, Texas, to-wit:

        That property in the Stafford Smith Survey, Abstract
    No. 1360, as described in deeds recorded in Volume 1059,
    Page 343, Volume 4146, Page 521, Volume 4583, Page 573,
    and Volume 4583, Page 578, of the Harris County Deed
    Records.

    The easement herein granted is an unobstructed easement
    described by metes and bounds as follows, all coordinates

DEED RECORDS
VOL 6603 PAGE 214

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

CEHE_000001

and bearings being referred to the Texas Plane Coor-
dinate System South Central Zone as established by the
U. S. Coast and Geodetic Survey in 1934 and based on
the position of U S C and G S triangulation station
"Liestman 1942":  X = 3,074,344.8; Y = 699,102.6:

BEGINNING at a point having coordinate X = 3,072,981.1;
Y = 693,727.7 in the north line of a 12.3-acre tract
described in deed recorded in Volume 4583, Page 578 of
Harris County Deed Records and the south line of Clodine-
Alief Road, said point being located N 82° 58' 00" E
129.75 feet from a 3/4-inch iron pipe set in the north-
west corner of said 12.3-acre tract; THENCE from the
point of beginning S 02° 03' 20" E 7423.30 feet to a
point for corner in the south line of the above referred
property and the north line of the James A. Phalen
property; THENCE S 87° 58' 00" W along the south line
of the above referred property and the north line of the
said James A. Phalen property 80 feet to a point for
corner; THENCE N 02° 03' 20" W along the east line of
United Gas Pipe Line Company's easement 7416.70 feet to
a 3/4-inch iron rod for point for corner set in the north
line of said 12.3-acre tract and the south line of
Clodine-Alief Road; THENCE N 82° 58' 00" E along the
north line of said 12.3-acre tract and the south line
of Clodine-Alief Road 80.30 feet to the place of
beginning and contains 13.627 acres of land.

Grantors, their successors, assigns, agents or licensees,
shall not have the right to cause or permit any obstruc-
tion except property line fences to be placed or
constructed within said easement area without the express
written consent of Grantee;

together with the following rights: (1) of ingress and egress

onto and from said right-of-way at each end of said right-of-

way, and from any public road crossing said right-of-way that

may hereafter be opened across the same,(but not across or

over the land of Grantors adjoining said right-of-way) for the

purpose of constructing, reconstructing, inspecting, patroling,

hanging new wires on, maintaining and removing said line and

appurtenances; (2) to remove from said right-of-way all

brushes, trees and parts thereof, or other obstructions, and

any branches of trees on adjoining land of Grantors to the

extent that such branches extend over and onto said right-of-

way, which, in the judgment of Houston Lighting & Power Company,

2

CEHE_000002

endangers or may interfere with the efficiency, safety or proper maintenance of said line or its appurtenances; and (3) of exercising all other rights hereby granted.

TO HAVE AND TO HOLD the above described easement and rights unto the said Houston Lighting & Power Company, its successors and assigns, until said line shall be abandoned.

And we do hereby bind ourselves, our heirs, legal representatives, successors and assigns, to warrant and Forever Defend all and singular the above described easement and rights unto the said Houston Lighting & Power Company, its successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof.

EXECUTED this 16th day of September, 1966.

_____
C. W. Duncan

_____
Mrs. Lynn C. Bousquet

_____
Mrs. Linnie D. Wynne

_____
Mrs. Marian Neal Rubey

_____
J. Robert Neal

_____
Mrs. Nina Neal Cullinan

BANK OF THE SOUTHWEST NATIONAL
ASSOCIATION, HOUSTON, AS TRUSTEE
UNDER THE WILL OF HERSCHEL MILLS
DUNCAN, DECEASED, AND AS TRUSTEE
UNDER THE WILL OF JAMES ROBERT NEAL,
DECEASED, AND NOT INDIVIDUALLY

By _____
Vice President and Trust Officer

ATTEST:

_____
Asst. Cashier

APPROVED AS TO FORM
BAKER, BOTTS, SHEPHERD & COATES
BY _____

3

CEHE_000003

DEED RECORDS VOL 6603 PAGE 216

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

THE STATE OF TEXAS )(
)(
COUNTY OF HARRIS )(

BEFORE ME, the undersigned authority, on this day per-
sonally appeared C. W. DUNCAN, known to me to be the person
whose name is subscribed to the foregoing instrument and
acknowledged to me that he executed the same for the purposes
and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this 21st day of
October , 1966.

_____
Notary Public in and for
Harris County, T e x a s

Notary Public in and for Harris County, Texas
My Commission Expires June 1, 1967

THE STATE OF TEXAS )(
)(
COUNTY OF HARRIS )(

BEFORE ME, the undersigned authority, on this day per-
sonally appeared LYNN C. BOUSQUET, wife of Thomas G. Bousquet,
known to me to be the person whose name is subscribed to the
foregoing instrument and having been examined by me privily
and apart from her husband, and having the same fully
explained to her, she, the said LYNN C. BOUSQUET, acknowledged
such instrument to be her act and deed, and she declared that
she had willingly signed the same for the purposes and con-
sideration therein expressed, and that she did not wish to
retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this 28th day of
October , 1966.

_____
Notary Public in and for
Harris County, Texas

THE STATE OF TEXAS )(
)(
COUNTY OF HARRIS )(

BEFORE ME, the undersigned authority, on this day per-
sonally appeared LINNIE D. WYNNE, wife of J. Jefferson Wynne,
known to me to be the person whose name is subscribed to the
foregoing instrument and having been examined by me privily
and apart from her husband, and having the same fully explained
to her, she the said LINNIE D. WYNNE, acknowledged such instrument
to be her act and deed, and she declared that she had willingly

CEHE_000004

signed the same for the purposes and consideration therein
expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this the *fifth*
day of *November*; 1966.

*Dorothy Hunt Holm*
Notary Public in and for
Harris County, Texas

DOROTHY HUNT HOLM

STATE OF *California* )(
COUNTY OF *Los Angeles* )(

BEFORE ME, the undersigned authority, on this day per-
sonally appeared J. ROBERT NEAL, known to me to be the person
whose name is subscribed to the foregoing instrument and
acknowledged to me that he executed the same for the purposes
and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this the 8
day of *October*, 1966.

JOSEPH F. PERRIN
My Commission Expires Oct. 16, 1968

*Joseph F. Perrin*
Notary Public in and for
*Los Angeles* County, *California*

STATE OF COLORADO )(
COUNTY OF PITKIN )(

BEFORE ME, the undersigned authority, on this day per-
sonally appeared MARIAN NEAL RUBEY, wife of William B. Rubey,
known to me to be the person whose name is subscribed to the
foregoing instrument and having been examined by me privily
and apart from her husband, and having the same fully explained
to her, she, the said MARIAN NEAL RUBEY, acknowledged such
instrument to be her act and deed and she declared that she
had willingly signed the same for the purposes and considera-
tion therein expressed, and that she did not wish to retract it.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, THIS the 28th day
of *Sept*, 1966.

*Janie L Mallikin*
Notary Public in and for
Pitkin County, Colorado
My Commission expires June 2, 1968

DEED RECORDS VOL 6603 PAGE 218

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

THE STATE OF *Florida*     X
                          X

COUNTY OF *Palm Beach*    X

         BEFORE ME, the undersigned authority, on this day
personally appeared NINA NEAL CULLINAN, wife of Craig Cullinan,
Jr., known to me to be the person whose name is subscribed to
the foregoing instrument and having been examined by me privily
and apart from her husband, and having the same fully explained
to her, she, the said NINA NEAL CULLINAN, acknowledged such
instrument to be her act and deed, and she declared that she
had willingly signed the same for the purposes and considera-
tion therein expressed, and that she did not wish to retract it.

         GIVEN UNDER MY HAND AND SEAL OF OFFICE, this the *5th*
day of *October*, 1966.

                         *Louise Winner*
                  Notary Public in and for
*Palm Beach* County,    *Florida*

N: .Y PUBLIC, STATE of FLORIDA at LARGE
MY COMMISSION EXPIRES JAN. 10, 1968
BONDED THROUGH FRED W. BIESTELHORST

THE STATE OF TEXAS    X
                       X
COUNTY OF HARRIS    X

         BEFORE ME, the undersigned authority, on this day
personally appeared NORMAN JOHNSON, Vice President and Trust
Officer of BANK OF THE SOUTHWEST NATIONAL ASSOCIATION, HOUSTON,
known to me to be the person and officer whose name is sub-
scribed to the foregoing instrument, and acknowledged to me
that the same was the act of the said Bank of the Southwest
National Association, Houston, a national banking association
and that he executed the same as the act and deed of such
association for the purposes and consideration therein expressed
and in the capacities therein stated.

         GIVEN UNDER MY HAND AND SEAL OF OFFICE, this *16*
day of *September*, 1966.

                     *Dorothy M. Stern*
                 Notary Public in and for
                 Harris County, T e x a s

RETURN TO:
HOUSTON LIGHTING & POWER COMPANY
P. O. BOX 1700
HOUSTON 1, TEXAS
(Mr. Brownlee)

DEAD RECORDS VOL 6603 PAGE 219

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

CEHE_000006

DEED RECORDS

6603 PAGE 220

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

C. W. DUNCAN, et al

GRANTORS

TO

HOUSTON LIGHTING & POWER COMPANY

GRANTEE

RIGHT-OF-WAY DEED

Bryan, Suhr, Bering & Bailey
ATTORNEYS AT LAW
2300 BANK OF THE SOUTHWEST BUILDING
HOUSTON, TEXAS 77002

STATE OF TEXAS
COUNTY OF HARRIS

I hereby certify that this instrument was FILED on
the date and at the time stamped hereon by me; and was
duly RECORDED, in the Volume and Page of the named
RECORDS of Harris County, Texas, as stamped hereon by
me, on

DEC 1 9 1966

COUNTY CLERK
HARRIS COUNTY, TEXAS

FILED
DEC 1 9 9 27 AM '1966
COUNTY CLERK
HARRIS COUNTY, TEXAS

CEHE_000007

A-3-6  990909  oF  538775  1ST A PD      28.00

AGREEMENT FOR UNDERGROUND ELECTRIC SERVICE
BRAEWOOD GLEN SUBDIVISION-SECTION 7
STAFFORD SMITH SURVEY 14, ABSTRACT 1360
HARRIS COUNTY, TEXAS

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

F538775



THIS AGREEMENT is made and entered into by and between Center Savings Association, a Texas corporation (hereinafter called "Developer") and Houston Lighting & Power Company, a Texas corporation (hereinafter called "Company"), for the furnishing of electric service to Braewood Glen Subdivision, Section 7, which is located in the Stafford Smith Survey 14, Abstract 1360. The part of the aforesaid Subdivision covered by this contract is fully shown on a plat thereof recorded in Volume 255, Page 118, of the Map Records of Harris County, Texas. The parties hereto covenant and agree as follows:

I.

AREA TO BE SERVED

A.  Underground Service: - Subject to the conditions hereafter specified, and in reliance upon the representation of Developer and the plat of the subdivision reflecting that there are 24 or more lots in said subdivision upon which dwelling units, as herein defined, are to be constructed, or that 24 or more dwelling units are to be constructed within said subdivision, Company agrees to install, own, operate and maintain an underground electric distribution system for the furnishing of electricity to the aforesaid subdivision, making underground service available to all lots which are platted in said subdivision at the execution of this contract, and all dwelling units to be constructed within said subdivision, said subdivision being hereinafter designated Underground Residential Subdivision. "Dwelling units" shall include homes, townhouses and duplexes built for sale or rent and wired so as to provide for separate metering to each dwelling unit, but shall exclude mobile homes, as hereinafter specified. (If an apartment structure is erected within the Underground Residential Subdivision and wired so as to provide separate metering to each dwelling unit, then underground service will be provided to such structure, or, at the option of Developer, Company will furnish any other available type of service, under the terms and conditions of a separate contract.)

B.  Reserves: - Except as hereafter provided, Company is not obligated under this contract to install facilities in Reserve(s) in Braewood Glen Subdivision, Section 7. If, however, Developer or any purchaser from Developer utilizes any reserve area for the erection of residential structures, such as homes, apartment structures, townhouses and duplexes, and if the development of such reserve area otherwise meets the requirements of Paragraph A above, then Company agrees to furnish underground service to the structures within such reserve area according to the terms and conditions of a separate contract.

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

CEHE_000017



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

Page 2 of 12    Monday, September 26, 2022    County Clerk Harris County, Texas



CEHE_000018

II.

INSTALLATION OF FACILITIES     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

A. Type of service: - The electric service furnished under
this agreement will be of the type described by Company as single phase,
120/240 volt, three wire, 60 cycle alternating current for lighting and
power.

B. Distribution System: - The underground electric
distribution system shall be installed in easements provided therefor
and shall consist of overhead primary feeder circuits constructed on
wood poles, single phase, underground primary and secondary circuits,
pad mounted or other type of transformers, junction boxes, and such
other appurtenances as shall be necessary to make underground service
available. Company reserves the right to construct such overhead
primary feeder lines within dedicated easements or easements otherwise
acquired at such points along the perimeter of the subdivision or
elsewhere as it may determine to be necessary for the furnishing of the
underground residential distribution system herein provided for or to
meet Company's general area requirements. At Company's option those
lots adjacent to such overhead distribution facilities may be served
from such overhead distribution system. Where overhead service is
furnished the distribution system will be installed in easements
provided therefor and shall consist of overhead primary and secondary
circuits, constructed on wood poles equipped with transformers and such
other appurtenances as shall be necessary to make overhead service
available. Company shall at all times have title to and complete
control over the facilities to be installed by it.

C. Preparation of Easement: - All easements for underground
distribution shall be kept free and clear of obstructions. Developer
agrees, at his expense, to have all lot corners and location of all
dwelling units accurately staked on the ground, to have all easements
cleared of trees, stumps, and other obstructions which would interfere
with Company's pole line or underground cable installation, and to
develop all easements and rights of way to final level grade, suitable
for machine trenching, before Company starts its installation.

D. Coordination of construction: - Developer agrees to
coordinate his construction work with Company's construction work in
such a way that Company's facilities can be installed without
interference due to construction of streets, sewers, water lines and
facilities of other utilities. In the event Developer interferes with
Company's installation of its facilities by the untimely installation of
streets or other facilities, Company shall give notice to Developer and
if the interference is not eliminated, a payment equivalent to the
additional cost to Company brought about by the interference will be
made by Developer and such shall be due upon the determination by
Company of such additional cost and the submission of an invoice
therefor.

E. Temporary service: - Temporary service for home
construction shall be available only to locations adjacent to existing
energized transformers or secondary junction boxes. The applicant for

CEHE_000019

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

temporary service will install a meter loop in accordance with the Company's then current Standards and Specifications and shall at his own cost, furnish and install necessary cable and appurtenances from the line side of the meter base to the designated point of service connection in compliance with applicant's service cable at Company's installed transformers or energized secondary junction boxes.  Charges for temporary service under the conditions outlined above will be the same as in overhead service areas.

      F.  <u>Service lines</u>: - The owner of each lot containing a single dwelling unit, or in the case of a multiple dwelling unit structure the Owner/Developer, shall at his or its own cost, furnish, install, own and maintain (all in accordance with the requirements of local governing authorities and the National Electric Code) the underground service cable and appurtenances from point of Company's metering at the dwelling unit or structure to the point of attachment at Company's installed transformers or energized secondary junction boxes, said point of attachment to be made available by Company at a point designated by Company at the property line of each lot.  Company shall make the necessary electrical connections at both the meter and the transformer or secondary junction box.  In addition, the owner of each lot containing a single dwelling unit, or in the case of a multiple dwelling unit structure the Owner/Developer, shall at his or its own cost, furnish, install, own and maintain a service entrance in accordance with Company's then current Standards and Specifications for the location and installation of the meter for the electric service to each dwelling unit.

      G.  <u>Construction schedule</u>: - It is understood and agreed that Company does not obligate itself to start construction of its facilities under this contract prior to sixty (60) days from the date of this contract.  However, Company will endeavor to start construction at an earlier date and expedite completion of the work provided for in this contract.  Construction will not be started until Developer has granted the easements provided for herein and met all conditions specified in Article II-C hereof.

III.

EASEMENTS

      A.  <u>Grant of easements</u>: - Developer by the execution of this agreement hereby grants to Company, and to the various homeowners within the Subdivision, all necessary easements for the installation, maintenance and operation of Company's electric distribution system and homeowner's facilities, as follows:

     1.  Easements along, over, under and across the thoroughfares and streets for Company's underground facilities.

     2.  Easements along, over, under and across those areas specified as utility easements for Company's underground facilities and necessary appurtenances, including, without limitation, pad mounted transformers and junction boxes, and in areas where service is to be overhead the utility

CEHE_000020



easements may be utilized for overhead facilities.

3.  Easements for the reciprocal benefit of the various
homeowners affording access to the area occupied by and
centered on the service wires of the various homeowners to
permit installation, repair and maintenance of each
homeowner's owned and installed service wires.

B.  Location of easements: - The Company shall have the right
to use the utility easements which are shown on the recorded plat of the
Subdivision as centered on the rear property lines of all lots, and such
additional easements as may be required for its underground distribution
system will be located at such points as the underground system
reasonably requires.

C.  Additional easements: - Developer further agrees to grant
to the Company and/or the various homeowners such additional easements
within the aforesaid Subdivision as shall be necessary for the
installation, maintenance and operation of Company's and homeowner's
facilities; however, this paragraph is intended to create an obligation
binding only on the Developer and the same is not to be construed as
creating a covenant running with the land or as binding on subsequent
purchasers of the lots in Braewood Glen Subdivision, Section 7.

D.  Easement instruments: - Developer agrees to execute the
customary additional instruments confirming the easememts and rights of
way heretofore granted or agreed to be granted, pursuant to this
contract.

IV.

DEED RESTRICTIONS

Developer agrees to include in the restrictions made
applicable to the Subdivision provisions substantially as follows:

"An underground electric distribution system will be installed
in that part of Braewood Glen Subdivision, Section 7, designated
herein as Underground Residential Subdivision, which underground
service area embraces all of the lots which are platted in Braewood
Glen Subdivision, Section 7, at the execution of this agreement
between Company and Developer or thereafter.  In the event that
there are constructed within the Underground Residential
Subdivision structures containing multiple dwelling units such as
townhouses, duplexes or apartments, then the underground service
area embraces all of the dwelling units involved.  The owner of
each lot containing a single dwelling unit, or in the case of a
multiple dwelling unit structure, the Owner/Developer, shall, at
his or its own cost, furnish, install, own and maintain (all in
accordance with the requirements of local governing authorities and
the National Electrical Code) the underground service cable and
appurtenances from the point of electric company's metering at the
structure to the point of attachment at such company's installed
transformers or energized secondary junction boxes, such point of
attachment to be made available by the electric company at a point

CEHE_000021

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

Page 6 of 12    Monday, September 26, 2022    County Clerk Harris County, Texas

designated by such company at the property line of each lot. The
electric company furnishing service shall make the necessary
connections at said point of attachment and at the meter.
Developer has either by designation on the plat of the Subdivision
or by separate instrument granted necessary easements to the
electric company providing for the installation, maintenance and
operation of its electric distribution system and has also granted
to the various homeowners reciprocal easements providing for access
to the area occupied by and centered on the service wires of the
various homeowners to permit installation, repair and maintenance
of each homeowner's owned and installed service wires. In
addition, the owner of each lot containing a single dwelling unit,
or in the case of a multiple dwelling unit structure the
Owner/Developer, shall at his or its own cost, furnish, install,
own and maintain a meter loop (in accordance with the then current
Standards and Specifications of the electric company furnishing
service) for the location and installation of the meter of such
electric company for each dwelling unit involved. For so long as
underground service is maintained in the Underground Residential
Subdivision, the electric service to each dwelling unit therein
shall be underground, uniform in character and exclusively of the
type known as single phase, 120/240 volt, three wire, 60 cycle,
alternating current.

"The electric company has installed the underground electric
distribution system in the Underground Residential Subdivision at
no cost to Developer (except for certain conduits, where
applicable, and except as hereinafter provided) upon Developer's
representation that the Underground Residential Subdivision is
being developed for residential dwelling units, including homes,
and if permitted by the restrictions applicable to such
subdivision, townhouses, duplexes and apartment structures, all of
which are designed to be permanently located where originally
constructed (such category of dwelling units expressly to exclude
mobile homes) which are built for sale or rent and all of which
multiple dwelling unit structures are wired so as to provide for
separate metering to each dwelling unit. Should the plans of the
developer or the lot owners in the Underground Residential
Subdivision be changed so as to permit the erection therein of one
or more mobile homes, Company shall not be obligated to provide
electric service to any such mobile home unless (a) Developer has
paid to the Company an amount representing the excess in cost, for
the entire Underground Residential Subdivision, of the underground
distribution system over the cost of equivalent overhead facilities
to serve such Subdivision or (b) the Owner of each affected lot, or
the applicant for service to any mobile home, shall pay to the
Company the sum of (1) $1.75 per front lot foot, it having been
agreed that such amount reasonably represents the excess in cost of
the underground distribution system to serve such lot or dwelling
unit over the cost of equivalent overhead facilities to serve such
lot or dwelling unit, plus (2) the cost of rearranging, and adding
any electric facilities serving such lot, which arrangement and/or
addition is determined by Company to be necessary.

"The provisions of the two preceding paragraphs also apply to

CEHE_000023



any future residential development in Reserve(s) shown on the plat of Braewood Glen Subdivision, Section 7, as such plat exists at the execution of the agreement for underground electric service between the electric company and Developer or thereafter. Specifically, but not by way of limitation, if a lot owner in a former Reserve undertakes some action which would have invoked the above per front lot foot payment if such action had been undertaken in the Underground Residential Subdivision, such owner or applicant for service shall pay the electric company $1.75 per front lot foot, unless Developer has paid the electric company as above described. The provisions of the two preceding paragraphs do not apply to any future non-residential development in such Reserve(s)."

V.

Payment by Developer: - The underground distribution system covered by this contract is being installed by Company at no cost to Developer (except for certain conduits, where applicable and except as hereinafter provided) upon Developer's representation that such Subdivision covered hereby is being developed for residential dwelling units, including homes, townhouses, duplexes and apartment structures, constructed upon the premises and designed to be permanently located where originally constructed (such category of dwelling units expressly to exclude mobile homes), and so wired as to provide for separate metering to each dwelling unit. Should Developer's plans as outlined to Company be changed so that mobile homes are to be erected, or should the Developer sell lots within the Underground Residential Subdivision for location thereon of mobile homes, Developer shall thereupon become liable to Company for $1.75 per front lot foot for all lots or dwelling units specified by this agreement to be within the Underground Residential Subdivision, such amount representing the excess in cost, for the entire Subdivision, of the underground distribution system being installed under this agreement over the cost of equivalent facilities for Company's standard overhead service; and Company shall not be further obligated to Developer under this contract until such payment shall have been made in full. In the event that Developer shall replat all or any part of the Subdivision, Company shall not be obligated to furnish the underground distribution system for services to the replatted lots or to the dwelling units located therein unless (a) the replatted lots or dwelling units to be located therein are to be constructed for "dwelling units" as hereinbefore defined, same being those constructed and designed to be permanently located where originally constructed (such category of dwelling units expressly to exclude mobile homes) and wired for separate metering to each dwelling unit in a multiple dwelling unit structure and (b) payment is made to Company of an amount equal to the excess cost of bringing underground service to the replatted lots over the cost of installing underground distribution system for service to the lots as originally platted. Further, in the event that the plans for the development of the Underground Residential Subdivision as outlined to Company be changed after Company has installed any of its underground service facilities, and if such change in plans will require the removal of or alteration of such installed facilities, then, except to the extent that such facilities remain suitable for serving any dwelling units called for by the change in plans, Developer shall pay to Company the cost to Company

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

Page 9 of 12   Monday, September 26, 2022   County Clerk Harris County, Texas

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

of installing and altering such facilities.

It is understood and agreed that the above provisions of this Article V also apply to any future residential development in Reserve(s) shown on the plat of Braewood Glen Subdivision, Section 7, as such plat exists at the execution of this contract or thereafter. Specifically, but not by way of limitation, if Developer undertakes some action in a former Reserve(s) which would have invoked the above per front lot foot payment if such action had been undertaken in the Underground Residential Subdivision, Developer shall pay Company $1.75 per front lot foot for all lots in both the Reserve(s) and the Underground Residential Subdivision.

It is also understood and agreed that if Developer undertakes any action in the lots within the Underground Residential Subdivision which invokes the above per front lot foot payment in said Underground Residential Subdivision, Developer shall pay $1.75 per front lot foot for any future installation of underground electric service in the above described Reserve(s).

The above provisions of this Article V do not apply to any future non-residential development in such Reserve(s).

This instrument constitutes the entire contract of the parties with respect to the matters herein contained and when duly executed shall be binding upon and inure to the benefit of both parties and their respective successors, legal representatives and assigns, but the agreement shall not be assignable by Developer without the written consent of Company.

EXECUTED in triplicate at Houston, Texas, as of the 18th day of November, 1977.

HOUSTON LIGHTING & POWER COMPANY

By: _____
Vice President

ATTEST: _____
ASST. Secretary                 COMPANY

CENTER SAVINGS ASSOCIATION

By: _____
President

ATTEST: Pat Cannon
ASST. Secretary                 DEVELOPER

7500 Bellaire Blvd.
Mailing Address

Houston, Texas  77036
City                          Zip

CEHE_000026

STATE OF TEXAS

COUNTY OF

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

BEFORE ME, the undersigned authority, on this day personally appeared _William S. Wilson_, President of _Center Savings Assn._, known to me to be the person and officer whose name is subscribed to the foregoing instrument, and acknowledged to me that the same was the act of the said _Association_, a _Texas Corporation_, and that he executed the same as the act and deed of such _Corporation_ for the purpose and consideration therein expressed and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the _18th_ day of _November_, 19 _77_.

_Iola J. Sunderland_
Iola J. Sunderland
NOTARY PUBLIC IN AND FOR
_Harris_ COUNTY, _Texas_

Notary Public in and for Harris County, Texas
My Commission Expires July 12, 1978

STATE OF TEXAS

COUNTY OF HARRIS

BEFORE ME, the undersigned authority, on this day personally appeared _D. D. Sykora_, Vice President of Houston Lighting & Power Company, known to me to be the person and officer whose name is subscribed to the foregoing instrument, and acknowledged to me that the same was the act of the said Houston Lighting & Power Company, a corporation, and that he executed the same as the act and deed of such corporation for the purposes and consideration therein expressed and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the _5th_ day of _January_, 19 _78_.

_Janet Van Wambeck_
NOTARY PUBLIC IN AND FOR
HARRIS COUNTY, TEXAS

JANET VAN WAMBECK
Notary Public in and for Harris County, Texas
My Commission Expires _4-30-79_

RETURN TO:
P. O. Kupec
HOUSTON LIGHTING & POWER COMPANY
P. O. BOX 1700
HOUSTON, TEXAS, 77001

CEHE_000027



Page 11 of 12   Monday, September 26, 2022

County Clerk Harris County, Texas

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

STATE OF TEXAS
COUNTY OF HARRIS

I hereby certify that this instrument was FILED in
File Number Sequence on the date and at the time stamped
hereon by me; and was duly RECORDED, in the Official
Public Records of Real Property of Harris County, Texas on

APR 0 3 1978



COUNTY CLERK,
HARRIS COUNTY, TEXAS

FILED

APR 3 10 12 AM 1978





COMCAST 000013
CEHE_000039







UNRESTRICTED RESERVE "D" CROWN COLONY WEST
VOL.173, PG. 52



COMCAST 000016
CEHE_000042



COMCAST 000017
CEHE_000043







A Patio Home Development

A REPLAT OF A REPLAT OF

BRAEWOOD GLEN SECTION 7

(TO REMOVE LOTS 58-61 OF BLOCK 1, AND PLACE INTO UNRES. RESERVE.)

Lots -142    Blocks-4    Reserve- 6.283 Ac.

Owners:    PULLEN HOMES, INC., CATALINA HOMES INC.,
& DARWOOD INVESTMENT, S.A.

Engineers:    BLOM ENGINEERING CORPORATION
8990 Park West Drive, Houston, Texas

June,1978    Scale 1:100'

COMCAST 000019
CEHE_000045



I, Teneshia Hudspeth, County Clerk of Harris County, Texas certify that these pages
are a true and correct copy of the original record filed and recorded in my office,
electronically or hard copy, as it appears on this date.

Witness my official hand and seal of office
This September 26, 2022

Teneshia Hudspeth, County Clerk
Harris County, Texas

Confidential information may have been redacted from the document in compliance with the Public Information Act.

COMCAST 000020
CEHE_000046